**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 7, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

JANE DOES 1-11; JOHN DOES 1, 3-7,

     Plaintiffs - Appellants,

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF COLORADO; TODD
SALIMAN, President of the University of
Colorado, in his official capacity;
DONALD M. ELLIMAN, Chancellor of
the University of Colorado Anschutz
Campus, in his personal and official
capacities; SHANTA ZIMMER, Senior
Associate Dean of Medical Education,
University of Colorado School of
Medicine, in her personal and official
capacities; ERIC MEDIAVILLA,
Associate Dean for Student Affairs,
University of Colorado School of Dental
Medicine, in his personal and official
capacities; ANN-MICHAEL HOLLAND,
Master of Science Program Director,
Department of Anesthesiology, in her
personal and official capacities; JOHN &
JANE DOES 19, members of the Vaccine
Verify team, in their official & personal
capacities,

     Defendants - Appellees.

Nos. 21-1414 & 22-1027

_____

**Appeals from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:21-CV-02637-RM-KMT)**

_____

Michael G. McHale, Thomas More Society, Omaha, Nebraska (Joseph B. Brown and Theresa L. Sidebotham, Telios Law, Monument, Colorado; and Peter C. Breen, Thomas More Society, Chicago, Illinois; with him on the briefs), for Plaintiffs-Appellants.

Jacquelynn Rich Fredericks, First Assistant Attorney General (Philip J. Weiser, Attorney General, Kathleen Spalding, Senior Assistant Attorney General, Grant T. Sullivan, Assistant Solicitor General, Megan Paris Rundlet, Senior Assistant Solicitor General; Hermine Kallman Special Assistant Attorney General, University of Colorado; and Matthew J. Smith and Gregory Goldberg, Holland & Hart, LLP; with her on the briefs), Denver, Colorado, for Defendant-Appellee.

_____

Before **HOLMES**, Chief Judge, **EBEL**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

A government employer may not punish some employees, but not others, for the same activity, due only to differences in the employees' religious beliefs. Likewise, the government may not test the sincerity of an employee's religious beliefs by judging whether his or her beliefs are doctrinally coherent or legitimate in the eyes of the government. Nor may a government employer discriminate against religion by implementing policies that exempt employees for secular reasons more readily than religious ones. All such discrimination violates the Free Exercise and Establishment Clauses of the First Amendment and the corresponding rights incorporated against the states by the Fourteenth Amendment. And when there is no plausible explanation for religious discrimination other than animus, it is subject to strict scrutiny, regardless of whether the government employer admits that its actions were motivated by hostility to certain religions.

This appeal concerns policies at the University of Colorado Anschutz Campus regarding religious exemptions from the University's COVID-19 vaccine mandate for employees and students. We must determine whether the employee plaintiffs in this case are entitled to preliminary injunctions against the Anschutz Campus Administration's policies, which in turn requires us to decide several questions. First, we hold that an employer such as the Administration cannot moot its employees' suits to enjoin unlawful policies by firing its employees under those policies. Therefore, we hold that at least one employee still has standing with respect to each policy at issue in this appeal. And because neither of the Administration's policies complies with the Constitution, the employee plaintiffs must prevail. We hold that a government policy may not grant exemptions for some religions, but not others, because of differences in their religious doctrines, which the Administration's first policy did. We further hold that the government may not use its views about the legitimacy of a religious belief as a proxy for whether such belief is sincerely-held, which the Administration did in implementing the first policy. Nor may the government grant secular exemptions on more favorable terms than religious exemptions, which the Administration's second policy does. Finally, we hold that the policies at issue in this appeal were motivated by religious animus, and are therefore subject to strict scrutiny—which neither policy survives. The district court concluded otherwise and, in so doing, abused its discretion. Accordingly, we reverse.

## I.     Factual & Procedural History

The University of Colorado announced in April 2021 that the University would require all employees and students to receive a COVID-19 vaccine by fall semester—with some exceptions.  Rather than announce a universal policy for medical, religious, or other exemptions, the University permitted each campus to adopt its own policy and process.  The Jane Doe and John Doe plaintiffs in this case (the "Does") were each employed by or enrolled at the University's Anschutz Campus, although some worked off-campus at other locations.  The administration of the Anschutz Campus (the "Administration") purported to allow "students and employees to attest to their exemption based on religious beliefs" using a simple form.  App'x Vol. V at 1036.  Each of the Does submitted such a form.

But in August 2021, the Administration began enforcing a new policy, which would officially take effect September 1, 2021 ("September 1 Policy").  The September 1 Policy declared that "[a] religious exemption may be submitted based on a person's religious belief whose teachings are opposed to all immunizations."  App'x Vol. V at 1123.  The Administration made clear that it would "only accept requests for religious exemption that cite to the official doctrine of an organized religion . . . as announced by the leaders of that religion*." Id*. at 1153.

To enforce this Policy, the Administration sent emails to each applicant for a religious exemption requiring the applicant to provide additional information about her religious beliefs.  Before it would grant an exemption, the Administration required an applicant to "explain why [her] sincerely held religious belief, practice or

observance prevents [her] from getting the vaccination," and to provide "a detailed response." App'x Vol. V at 1042. The Administration also asked each applicant to explain whether she "had an influenza or other vaccine in the past," and to answer: "How does this differ?" *Id.* Some applicants provided pages of detailed justification for their religious beliefs.

In response, the Administration rejected any application for a religious exemption unless an applicant could convince the Administration that her religion "teaches [her] and all other adherents that immunizations are forbidden under all circumstances." App'x Vol. V at 1056. Therefore, as the Administration explained to Anschutz students and employees, Christian Scientists and Jehovah's Witnesses would qualify for an exemption under the Administration's criteria. However, the Administration would reject an application for an exemption if it deemed the applicant's beliefs "personal," not "religious," or "not part of a comprehensive system of beliefs*." Id.* at 1077–78, 1129. For example, the Administration decided that "it is 'morally acceptable' for Roman Catholics to take vaccines against COVID-19," and that any Roman Catholic objections to the COVID-19 vaccine are "personal beliefs," not "religious beliefs." *Id.* at 1162–63. As a result, the Administration would not grant exemptions to Roman Catholic applicants under the September 1 Policy. For similar reasons, the Administration refused to approve exemptions for Buddhist applicants. Nor would the Administration approve

exemptions for applicants who were members of the Eastern Orthodox Church.[1]  The Administration also rejected exemption applications from Evangelical Christians, non-denominational Protestants, and applicants who did not specify whether they were affiliated with a particular religious organization.

Accordingly, the Administration denied all of the Does religious exemptions under the September 1 Policy, and it enforced the vaccine mandate against them.  For instance, on September 20, the Administration placed Jane Doe 9 on unpaid administrative leave and fired her, effective October 2, due to her "failure to comply" with the "mandatory vaccine requirement."  App'x Vol. VI at 1383.  On September 21, the Administration told Jane Doe 2 that she would be fired in four days, but the Administration permitted her to resign in lieu of termination so that she could keep her medical license.  Under the September 1 Policy, the Administration also denied Jane Does 1, 3, 10, and 11 any exemption or accommodation.  The Administration required Jane Does 4, 5, and 6 and John Does 3, 4, 5, and 7 to work remotely, and it cut Jane Doe 5's pay by ten percent.

In response to the September 1 Policy, the Administration received several demand letters in September 2021.  The Does' counsel sent at least two such letters: one on September 3, and another on September 15.  Both letters threatened suit.

After receiving threats of litigation, the Administration announced a new COVID-19 vaccine policy, effective September 24, 2021 ("September 24 Policy").

---

[1]  Also known as the Orthodox Church, the Orthodox Christian Church, or the Orthodox Catholic Church.

Under the September 24 Policy, "[a] religious accommodation may be granted based on an employee's religious beliefs," but "will not be granted if the accommodation would unduly burden the health and safety of other Individuals, patients, or the campus community." App'x Vol. V at 1256. The September 24 Policy employs a similar, but not identical, exemption standard for medical accommodations. *See id.* at 1255–56 ("A medical accommodation will not be granted, if the accommodation poses an undue hardship or the accommodation poses a direct threat to the health or safety of the Individual or others."). The September 24 Policy does not provide any religious exemption or accommodation to students.

Jane Doe 1 and John Doe 1 filed suit to enjoin the September 1 Policy on September 29, 2021. That same day, they filed a motion for a preliminary injunction. Meanwhile, the Administration continued to enforce the September 1 Policy and, among other things, proceeded to terminate Jane Doe 2 on October 2 as threatened. On October 25, the district court denied the Does' motion, ruling that the Does had "fail[ed] to make a threshold showing as to mootness" with respect to the September 1 Policy. App'x Vol. III at 626.

So, on October 29, the Does filed an Amended & Supplemental Complaint ("Amended Complaint"). Their Amended Complaint added sixteen Doe plaintiffs: Jane Does 2 through 11 and John Does 2 through 7. In their Amended Complaint, the Does seek a preliminary injunction of both the September 1 and September 24 Policies. Namely, the Does request a preliminary injunction:

(1) restraining and enjoining the Defendants, their officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the

    (a) September 1 Policy, to the extent it prohibits religious exemptions unless an individual holds religious beliefs that oppose all vaccinations or are in accord with official denominational "teachings,"

    (b) September 24 Policy, to the extent it denies students the right to seek and receive religious exemptions,

    (c) both Policies, to the extent Defendants improperly intrude into the sincerity of religious objectors at Anschutz by discerning Plaintiffs' sincerity through questioning the legitimacy of their religious beliefs or in any way more intensely than they do into the sincerity of religious objectors on other University campuses,

    (d) both Policies, to the extent Defendants prohibit Plaintiffs from receiving the same accommodations allowed for individuals who have actually received medical exemptions or for those on other University of Colorado campuses who present a comparable or greater risk of spreading COVID-19 than Plaintiffs;

(2) ordering that Plaintiffs be granted their requested religious exemptions; and

(3) ordering that all prior denials of requested religious exemptions under the Policies (whatever the requesters may have called them) be revoked and the requests re-examined under conditions compliant with the United States and Colorado Constitutions[.]

App'x Vol. V at 1101. They also seek other relief, including a permanent injunction and damages. On November 2, 2021, based on their Amended Complaint, the Does renewed their motion for a preliminary injunction.

The Administration did not reconsider any of the Does' applications for religious exemptions under the September 24 Policy until December. At that time, it reevaluated the employee Does. In reevaluating the employee Does under the September 24 Policy, the Administration scrutinized each application to determine whether "the request [wa]s made based on a sincerely-held religious belief," or

8

whether it was based on beliefs the Administration deemed "personal" in nature.
App'x Vol. VI at 1328–29.

The Administration did not grant any of the Does a religious exemption under the September 24 Policy. Accordingly, the Administration placed non-exempt clinical employees on leave or fired them. For example, after reevaluating Jane Doe 1 under the September 24 Policy, the Administration placed her on paid leave until February 2022, and then fired her. After reevaluating Jane Doe 3, the Administration placed her on indefinite unpaid leave. Under the September 24 Policy, the Administration also placed Jane Doe 10 on unpaid leave for thirty days, and then fired her. And under the same Policy, the Administration placed Jane Doe 11 on paid leave until January 31, 2022, then fired her, too.

The Administration did not fire non-clinical employees who were again denied religious exemptions under the September 24 Policy. Instead, as the Administration had under the September 1 Policy, it banned such employees from campus, and, in at least one case, cut an employee's pay. After reevaluating their applications in December, the Administration continued to require Jane Does 4, 5, and 6 and John Does 3, 4, 5, and 7 to work remotely. It also continued to pay Jane Doe 5 only ninety percent of her original pay.

On January 27, 2022, the district court denied the Does' renewed motion for a preliminary injunction. The district court denied the Does' motion to enjoin the September 1 Policy as moot, ruling that a preliminary injunction of the Policy "would have no effect in the real world." App'x Vol. VII at 1667–68. It also concluded that

the Does had not met their burden to show they are entitled to a preliminary injunction of the September 24 Policy.

The district court concluded that the Does were unlikely to succeed on the merits of their claims regarding the September 24 Policy. The court ruled that the Policy was neutral both on its face and as applied to the Does, reasoning that the Does were unlikely to establish that the Policy was adopted "with the aim of suppressing religious belief." App'x Vol. VII at 1670 (internal quotation marks omitted). The district court also concluded that the Policy did not provide "individualized exemptions," and therefore did not impermissibly "invite[] the government to consider the particular reasons for a person's conduct." App'x Vol. VII at 1672 (internal quotation marks omitted). The district court determined that "the fact that the [Administration] amended its policy while navigating a monthslong global pandemic does not show that its reasons for denying religious exemptions for students are pretextual." *Id*. at 1670. Accordingly, the district court decided that the Policy was generally applicable. The district court therefore declined to apply strict scrutiny and ruled that the Does were unlikely to succeed in showing the September 24 Policy is unconstitutional.

The district court also concluded that the other preliminary injunction factors weighed against the Does. The court determined that the Does had "failed to demonstrate a likelihood of success on their constitutional claims," and thus ruled that their "asserted harm is not of a constitutional dimension," and therefore not irreparable. App'x Vol. VII at 1674. Finally, the court decided that the public

interest would not be served by enjoining the September 24 Policy because of the Administration's interest in promoting vaccination among employees and students.

The Does timely appealed both denials of their motions for preliminary injunctions.[2]  On appeal, the Does contend that the September 1 and September 24 Policies "violat[e] their fundamental rights as guaranteed by the First Amendment's Religion Clauses"—both of them—and thus seek relief under both clauses.  Aplt. Br. at 32.[3]

Since the Does filed this appeal, the parties have filed numerous letters updating this Court about changes in the Does' status and the Administration's policies.[4]  The Does have informed us that "Jane Does 7 and 8 and John Does 3, 4, and 6 no longer need preliminary injunctive relief."  Aplt. Response to Aple. Letter Pursuant to Fed. R. App. P. 28(j) (Aug. 16, 2023) ("August 16 Letter") at 2.  In addition, the Administration tells us that Jane Does 4, 5, and 6, and John Does 5 and 7 have been instructed that they may return to campus, notwithstanding the fact that they are unvaccinated and maintain their religious beliefs opposing the COVID-19 vaccine.  Aple. Letter Pursuant to Fed. R. App. P. 28(j) (Aug. 11, 2023)

---

[2]  John Doe 2 was voluntarily dismissed and did not appeal.

[3]  The partial dissent suggests that the Does "did not raise [the Establishment Clause] on appeal."  Partially Dissenting Opinion ("Dissent. Op.") at 14 n.4; *see also id.* at 6 n.2.  But the Does raise the "Religion Clauses" and cite cases that commingle analysis of the two clauses.  As we routinely do in appeals involving the Religion Clauses, we consider whether the challenged conduct violates either the Establishment Clause or the Free Exercise Clause, or both.

[4]  As most of these letters do not inform our decision, we do not recount all of them here.

("August 11 Letter") at 2.  Finally, the Does have advised the Court that Jane Does 1, 2, 3, 10, and 11 remain "under- or entirely unemployed" as a result of the September 1 and September 24 Policies.  August 16 Letter at 2.

## II.    Standard of Review

We must reverse a district court's denial of a preliminary injunction if the district court abused its discretion.  *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009).  A district court abuses its discretion when it "commits an error of law or makes clearly erroneous factual findings."  *Id.*  An abuse of discretion may be "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.*  We examine questions of law de novo and we review factual findings for clear error.  *Id.*

## III.    Our Court has the constitutional authority to resolve this appeal.

It is within our constitutional authority to resolve this appeal.  "Our authority under the Constitution is limited to resolving 'Cases' or 'Controversies.'"  *Dep't of Educ. v. Brown*, 143 S. Ct. 2343, 2351 (2023) (citing U.S. Const. art. III, § 2); *see also* U.S. Const. art. III, § 1.  Accordingly, a plaintiff in federal court "must demonstrate that he possesses a legally cognizable interest, or personal stake, in the outcome of the action" from the outset, or his suit must be dismissed.  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted).  If "at least one plaintiff" has a personal stake—called "standing"—then "the suit may proceed."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).  And at least one plaintiff must maintain a personal stake, such that "an actual controversy" is

"extant at all stages of review, not merely at the time the complaint is filed."

*Symczyk*, 569 U.S. at 71.  Otherwise, "the action can no longer proceed and must be

dismissed as moot."  *Id.* at 72.  These related doctrines, standing and mootness,

"implement[]" the Constitution's "limit on our authority."  *Brown*, 143 S. Ct. at 2351.

We review de novo whether the litigants before us have standing and whether the

case is moot.  *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293,

1296 (10th Cir. 2023); *Schell v. OXY USA Inc.*, 814 F.3d 1107, 1114 (10th Cir.

2016).

At least one plaintiff had a personal stake in enjoining each Policy at issue in

this case when the Does filed their Amended Complaint.  And at least one plaintiff

still has a personal stake in enjoining each Policy as it concerns employees.

Therefore, this appeal remains an Article III case that a federal court has the

authority to resolve.[5]

### A.  At least one plaintiff had standing to seek a preliminary injunction regarding each Policy.

At the time of the Amended Complaint, at least one plaintiff in this case had

demonstrated Article III standing to challenge each Policy at issue in this appeal.

"The party invoking federal jurisdiction bears the burden of establishing standing,"

---

[5]  Appeal number 21-1414 appeals the denial of a motion for a preliminary injunction under the Does' first complaint.  That complaint was superseded by the Does' Amended Complaint, thereby mooting the motion.  We therefore cannot grant any effective relief in appeal number 21-1414.  We GRANT the Administration's motion to dismiss appeal number 21-1414 as moot, and consider only appeal number 22-1027.

13

so it is the Does' burden here. *W. Watersheds Project*, 62 F.4th at 1296. "To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021) (internal quotation marks omitted). A plaintiff must have standing to invoke the district court's jurisdiction "at the commencement of the litigation," and she must "demonstrate standing for each form of relief sought"—here, a preliminary injunction. *W. Watersheds Project*, 62 F.4th at 1296 (internal quotation marks omitted).

The Does met their burden. With respect to the September 1 Policy, each of the Does had standing at the time of the Amended Complaint because each had been denied a religious exemption under the September 1 Policy, and the preliminary injunction the Does sought was likely to redress their injuries by requiring the Administration to revoke and to reconsider its denials. When the Does filed their Amended Complaint on October 29, 2021, each had been denied a religious exemption under the September 1 Policy. *See, e.g.*, App'x Vol. V at 1027 ("In late August 2021, [Jane Doe 4's] request to be exempted from Defendants' vaccine mandate . . . was denied with finality [under the September 1 Policy].")
Accordingly, they each had suffered an injury-in-fact traceable to the challenged policy. *See Uzuegbunam*, 141 S. Ct. at 797. No plaintiff was reevaluated under the September 24 Policy until after the Does filed their Amended Complaint. *See* App'x Vol. VI at 1328 ("[R]e-evaluations of all employee requests for religious

accommodation that were evaluated under the prior September 1, [sic] policy . . . will be completed by the end of December 2021."); *see also, e.g.*, *id.* at 1332 (reevaluating Jane Doe 4 under the September 24 Policy on December 9, 2021). Therefore, at the time of the Amended Complaint, a preliminary injunction requiring the Administration to revoke and to reconsider its decisions under the September 1 Policy would have redressed the Does' injuries. *Uzuegbunam*, 141 S. Ct. at 797. That is enough for standing.

Although it had not yet been enforced against them, the Does also had standing with respect to the September 24 Policy. At the time the Amended Complaint was filed, Jane Does 1 through 11 and John Does 1 through 7 were each employed by Anschutz, enrolled there, or seeking restoration of his or her employment or enrollment. The Does all had reason to believe they would likely be subject to the September 24 Policy, and therefore suffer constitutional injury to their rights to exercise their religions and to be free from the government's establishment of religion. The injunction they sought would remedy that injury by requiring the Administration properly to issue religious exemptions. Thus, the Does also had standing to seek a preliminary injunction of the September 24 Policy.

Since "at least one plaintiff" had standing with respect to each Policy at the time of the Amended Complaint, the Does' suit does not fail for lack of standing. *Nebraska*, 143 S. Ct. at 2365.

**B.    There remains an actual controversy with respect to both Policies.**

At least one employee plaintiff still has standing to seek injunctive relief with respect to each Policy, so neither appeal is moot with respect to the Administration's policies for employees.  However, no student has standing to seek a preliminary injunction, so this appeal is moot as it concerns the Administration's policies for students.

The Constitution's limit on our authority is continuous; thus, if no "actual controversy" remains, "the action can no longer proceed and must be dismissed as moot."  *Symczyk*, 569 U.S. at 71–72.  To maintain an "actual controversy," at least one plaintiff must maintain standing "at all stages of review, not merely at the time the complaint is filed."  *Id.*  If there is still "at least one plaintiff" who "clearly has standing" and whose "claim is not moot," that "is sufficient to satisfy Article III's case-or-controversy requirement."  *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 29 n.1 (10th Cir. 2013).  "The burden of demonstrating mootness is a heavy one," and it falls upon the Administration in this case.  *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012) (internal quotation marks omitted).

The Administration failed to meet its heavy burden to show that this appeal is moot with respect to the employee Does.  The Does concede that "Jane Does 7 and 8 and John Does 3, 4, and 6 no longer need preliminary injunctive relief."  August 16 Letter at 2.  Accordingly, although those plaintiffs' actions for damages remain live, their claims for preliminary injunctive relief are moot.  Furthermore, this appeal is moot as it concerns the one remaining student, John Doe 1, because he intends to

16

seek a leave of absence from Anschutz no matter the outcome of this appeal.

However, there is still an actual controversy with respect to at least one employee

plaintiff for each Policy, so the Does' appeal of the district court's denial of their

motion for a preliminary injunction is not moot as it concerns the policies applied to

employees.

1.    **At least Jane Does 2 and 9 have standing to seek a preliminary injunction of the September 1 Policy.**

Because they are still suffering injury from the enforcement of the

September 1 Policy, Jane Does 2 and 9 still have standing to seek equitable relief

with respect to such policy, and their appeal is not moot.  The district court ruled that

the September 1 Policy was moot in part because the Does "ha[d] not established"

otherwise.  App'x Vol. VII at 1668.  But the burden here falls upon the

Administration as the party asserting mootness.  *Rezaq*, 677 F.3d at 1008 (burden

falls on party asserting mootness).  To place the burden on the Does was contrary to

our precedent, and therefore an abuse of discretion.  *See Tyson Foods*, 565 F.3d

at 775.  Had the district court held the Administration to its heavy burden, the district

court would have reached a different conclusion:  the Administration failed to show

that equitable claims regarding the September 1 Policy are moot.

The Administration contends that the September 1 Policy is dead letter

because it was "rescinded and replaced" with the September 24 Policy.  Aple. Br.

at 23.  The Administration further attests that there is no risk that the September 1

Policy "continues to be in effect or is likely to be reinstated."  *Id.* at 24.  As the

17

Administration would tell it, there is no threat the September 1 Policy will ever be enforced against any plaintiff in the future.

If that were true, it would come as welcome news to Jane Doe 2. But as far as this Court is aware, the Administration has not changed its application of the September 1 Policy to Jane Doe 2. The Administration informed Jane Doe 2 on September 21, 2021, that the Administration was firing her under the September 1 Policy, effective September 25. She was given the option of resigning in lieu of termination to preserve her licensure, and she took it. The Administration has made no attempt to reevaluate or to rehire her under the September 24 Policy or any subsequent policy. Therefore, Jane Doe 2 continues to suffer harm from the Administration's initial application of the September 1 Policy and its failure to reverse course. Although the Administration is right that "self-correction . . . provides a secure foundation for mootness so long as it seems genuine," the Administration has not corrected its enforcement of the September 1 Policy against Jane Doe 2, so there has been no opportunity for this Court to consider whether such self-correction would be genuine. Aple. Br. at 23 (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1118 (10th Cir. 2010)).

A preliminary injunction would abate Jane Doe 2's continuing injury. Among other things, the Does seek a preliminary injunction "ordering that all prior denials of requested religious exemptions under the Policies . . . be revoked and the requests re-examined under conditions compliant with the United States and Colorado Constitutions." App'x Vol. V at 1101. Because Jane Doe 2 was most recently

denied a religious exemption under the September 1 Policy, and because the

Administration's denial of that exemption has never been reconsidered under any

subsequent policy, a preliminary injunction would require the Administration to

revoke and to re-examine its application of the September 1 Policy to Jane Doe 2.

That relief would necessarily entail revocation of the Administration's decision

unlawfully to terminate Jane Doe 2's employment under the September 1 Policy.

Therefore, this Court "could . . . cause a real-world effect through a favorable

decision" for Jane Doe 2.  *W. Watersheds Project*, 62 F.4th at 1298.  Since a

preliminary injunction would redress Jane Doe 2's injury under the September 1

Policy, Jane Doe 2 has the necessary personal stake in obtaining such injunction, and

her appeal is not moot.[6]

The same is true of Jane Doe 9.  On September 20, 2021, the Administration

placed Jane Doe 9 on unpaid administrative leave and fired her effective October 2,

2021.  The Administration told Jane Doe 9 that it fired her "[d]ue to [her] failure to

comply with the [Administration's] vaccination policy," namely, the "mandatory

vaccine requirement" for those who work on-campus who have not been granted an

exemption.  App'x Vol. VI at 1383.  The Administration did not reevaluate Jane

---

[6]  The Administration also contends that Jane Doe 2's appeal is moot because
the district court dismissed her from the underlying case.  *See* Aple. Letter Pursuant
to Fed. R. App. P. 28(j) (Oct. 4, 2022).  But the district court has not entered any
final judgment as to Jane Doe 2, so she maintains a stake in the outcome of this
appeal.  *Cf. U.S. ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1512 (10th Cir. 1988)
(holding an appeal regarding preliminary injunction mooted by final judgment); *see
Wellington v. Daza*, 795 F. App'x 605, 608 (10th Cir. 2020) (unpublished) ("[B]y its
plain terms, this rule applies only where there is a *final* judgment.").

Doe 9 under the September 24 Policy, and the Administration did not rescind its decision made under the September 1 Policy, so Jane Doe 9 continues to suffer harm from the September 1 Policy.  Therefore, like Jane Doe 2, Jane Doe 9 has a personal stake in a preliminary injunction revoking the Administration's unlawful decision to fire her under the September 1 Policy.  Jane Doe 9's appeal is not moot, either.

As the Administration would tell it, its enforcement of the September 1 Policy was complete after it fired Jane Does 2 and 9, so no equitable relief is available to either.  But that would be true only if federal courts were powerless to enjoin unlawful behavior that has already begun.  If the Administration were correct, any state could adopt a policy that all state employees must be Roman Catholic; rush to enforce it by firing Protestants, Buddhists, Jews, atheists, and others; nominally repeal the policy, without rehiring anybody; and then claim any suits for injunctive relief were moot, leaving only damages actions likely barred by sovereign immunity.

Fortunately for state employees of all faiths, it is not so easy to evade the federal courts' powers in equity.  "It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo."  *Porter v. Lee*, 328 U.S. 246, 251 (1946).  If, "without any fault of the defendant, an event occurs which renders it impossible for this court . . . to grant [the plaintiff] any effectual relief whatever," the case is moot.  *Mills v. Green*, 159 U.S. 651, 653 (1895).  But if the defendant is responsible for the intervening events, "the court nevertheless is not

deprived of the authority, whenever, in its opinion, justice requires it . . . to compel the defendant to undo what he has wrongfully done since that time." *Id.* at 654.

This case is not moot because the Administration is at fault for firing Jane Does 2 and 9 after receiving notice of this suit. The Administration received notice of this suit on September 16, denied Jane Doe 2's exemption the next day, informed Jane Doe 9 on September 20 that she would be fired, and told Jane Doe 2 the same on September 21. The Does filed suit to enjoin the Policy on September 29, but the Administration still proceeded to fire Jane Doe 9 on October 2. Accordingly, Jane Does 2 and 9 are "entitled to seek a restoration of the status quo in this case," namely, their employment. *Porter*, 328 U.S. at 251. Likewise, we have the authority to compel the Administration "to undo what [it] has wrongfully done." *Mills*, 159 U.S. at 654.

Furthermore, even after a policy is repealed, "injunctive relief is still called for" when an appellant "remain[s] under a constant threat" that the policy will be reinstated or enforced in the future. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). The Administration argues that it has no intent to enforce the "now-defunct September 1 Policy" or anything like it. Aple. Br. at 24. We are unconvinced. It is easy enough for a defendant to say, while still under the watchful eye of the judiciary, that the defendant has no intent of resuming its poor behavior. *See, e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2606–07 (2022). But when the government demonstrates religious animus as severe as the Administration's animus in this case, *see infra* at Part IV.A.1., a court must look skeptically at the

government's claimed change of heart.  And since the Administration has yet to reverse its decisions to fire Jane Does 2 and 9 under the September 1 Policy, the Administration has provided no justification for us to set aside our skepticism.  For this reason, too, the Does' request for a preliminary injunction of the September 1 Policy is not moot.

2.    **At least Jane Does 1, 3, 10, and 11 have standing to seek a preliminary injunction of the September 24 Policy.**

Several of the employee Does maintain standing to seek a preliminary injunction against enforcement of the September 24 Policy because they still suffer a continuing injury from it.  In December 2021, the Administration finally reevaluated its current employees under the September 24 Policy.  Under the September 24 Policy, the Administration placed Jane Doe 1 on paid leave until February 2022, and then fired her.  The Administration placed Jane Doe 3 on indefinite unpaid leave.  The Administration placed Jane Doe 10 on unpaid leave for thirty days, and then fired her.  The Administration placed Jane Doe 11 on paid leave until January 31, 2022, then fired her, too.  As far as this Court is aware, Jane Does 1, 3, 10, and 11 remain "under- or entirely unemployed."  August 16 Letter at 2.

Jane Does 1, 3, 10, and 11 maintain standing to seek an injunction revoking the Administration's decisions to place them on leave or to fire them under the September 24 Policy.  Because Jane Does 1, 3, 10, and 11 are suffering from the Administration's continued enforcement of the September 24 Policy against them, an

injunction requiring the Administration to revoke its unlawful decisions under the Policy would abate their continuing constitutional injury.

The parties dispute whether this appeal is moot with respect to employees who were forced to work remotely, but who now have been given permission to return to the Anschutz Campus. *Compare* August 11 Letter at 2, *with* August 16 Letter at 2–3. Namely, Jane Does 4, 5, and 6, and John Does 5 and 7 have been instructed that they may return to campus, notwithstanding that they are unvaccinated and maintain their religious beliefs opposing the COVID-19 vaccine. August 11 Letter at 2. These Does contend their appeal is not moot because they have no assurances the Administration will not resume its unconstitutional conduct. August 16 Letter at 2–3. However, because this appeal is certainly not moot with respect to Jane Doe 1, 3, 10, or 11, we need not resolve the mootness question for Jane Doe 4, 5, or 6, or John Doe 5 or 7. Since "at least one plaintiff" still has a personal stake in our decision regarding the September 24 Policy, "the suit may proceed." *Nebraska*, 143 S. Ct. at 2365; *see Taylor*, 713 F.3d at 29 n.1 (explaining that the presence of "at least one plaintiff" who "clearly has standing" and whose "claim is not moot . . . is sufficient to satisfy Article III's case-or-controversy requirement").

### 3. The students' appeals are moot.

No student still has standing to seek a preliminary injunction in this case, and this appeal is therefore moot as it concerns the September 24 Policy for students. This appeal involved four students: Jane Does 7 and 8, and John Does 1 and 6. The Does concede that this appeal is moot as it concerns Jane Does 7 and 8 and John

Doe 6. They contend only that the original student Plaintiff, John Doe 1, still has standing to seek an injunction against enforcement of the September 24 Policy for students.

This appeal is also moot as it concerns John Doe 1 because a preliminary injunction would not have any effect on John Doe 1 in the real world. We have no constitutional authority to issue a decision that would have no "real-world effect." *W. Watersheds Project*, 62 F.4th at 1298. According to the Does, John Doe 1 "intends to seek an additional Leave of Absence . . . given his current financial inability to afford the increased tuition since he was forced into his initial Leave of Absence, along with the lack of protection for his religious objection to COVID vaccination." August 16 Letter at 2. John Doe 1 may still have non-moot claims for other relief at law or in equity. However, because John Doe 1 cannot afford the increased tuition at Anschutz, and because he intends to take a leave of absence regardless of the outcome of this appeal, we cannot grant any effective *preliminary* relief to John Doe 1, and our disposition of this appeal would have no "real-world effect" on him. *W. Watersheds Project*, 62 F.4th at 1298. Accordingly, although the students may still seek damages for any deprivation of their constitutional rights, no student still has standing to seek a preliminary injunction of the September 24 Policy, and the students' appeals are moot. Our further analysis of the September 24 Policy concerns only the Policy as it applies to employees.

Because the Does have standing and this appeal is not moot as to the September 1 Policy or the September 24 Policy as they concern employees, we may proceed to the merits.

**IV.     The district court abused its discretion in failing to enjoin either Policy.**

The district court abused its discretion in failing to grant the Does' motion for a preliminary injunction of the September 1 and September 24 Policies.  "Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show:  (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) ("*Hobby Lobby*"), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).  The third and fourth prongs "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

When evaluating likelihood of success on the merits, it is critical to consider all factors that may bear on the probability that the moving party will succeed.  For instance, when the Supreme Court evaluates the likelihood of success on the merits, it must also weigh the likelihood that the Supreme Court will "grant review in the case."  *Does 1-3 v. Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring); *see also United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring); *Labrador v. Poe ex rel Poe*, No. 23A763, 2024 WL 1625724, at *9 (U.S. Apr. 15, 2024) (Kavanaugh, J., concurring).  In an appeal on the final merits, an appellant's success

25

on one issue may render it redundant, and thus unnecessary, for us to decide further issues. (For instance, if an appellant has forfeited a claim, we typically do not resolve it on the merits.) At the preliminary injunction stage, though, our task differs. If the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable. Accordingly, we may in our discretion consider all of a moving party's potential paths to success on the merits, even if his ultimate success on one claim would render the other claims redundant.

The burdens of proof are distributed among the parties here. "To succeed in [their] quest for a preliminary injunction," the Does "assume[] the burden of making a strong showing that [they are] likely to succeed on the merits." *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012). However, "burdens at the preliminary injunction stage track the burdens at trial," so the Administration "bears the burden of proof on the ultimate question of the challenged [rules'] constitutionality." *Id.* (internal quotation marks and citation omitted). Accordingly, if the Does show that the Administration "has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable,'" this Court must "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531 (1993) ("*Lukumi*")).

**A.      The district court abused its discretion in failing to enjoin the September 1 Policy.**

All the factors weigh in favor of granting a preliminary injunction of the

September 1 Policy, and the district court abused its discretion in failing to do so.

The Does are highly likely to succeed on the merits, because the September 1 Policy

discriminates on its face and in fact against certain religions due to stereotypes and

religious animus.  Moreover, the irreparable constitutional harm the Does continue to

suffer outweighs any public interest against enjoining the September 1 Policy.

**1.      The Does are likely to prevail on the merits.**

The Does are likely to succeed on the merits because the September 1 Policy

clearly violates the Establishment Clause and the Free Exercise Clause as interpreted

by our precedents.  The First Amendment bars Congress from making any "law

respecting an establishment of religion, or prohibiting the free exercise thereof."

U.S. Const. amend. I.  The Fourteenth Amendment secures these First Amendment

rights against the states.  U.S. Const. amend. XIV, § 1; *see Lukumi*, 508 U.S. at 531.

But the Administration, in its September 1 Policy, ran afoul of both guarantees.

**a.      The Does are likely to prevail because the September 1 Policy is categorically unconstitutional.**

Because the September 1 Policy is permeated with animus against certain

religions, and because it involves an intrusive inquiry into the Does' religious beliefs,

the Does are likely to prevail on their Free Exercise Clause and Establishment Clause

claims.  If a government policy is motivated by religious animus, the policy is

categorically unconstitutional under the Free Exercise Clause.  *Ashaheed v.*

27

*Currington*, 7 F.4th 1236, 1244 (10th Cir. 2021).  For similar reasons, a government policy that requires an intrusive inquiry into the validity of religious beliefs violates the Establishment Clause regardless of any purported government interest.  *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1261 (10th Cir. 2008).  The September 1 Policy thus violates both.

i.      **The September 1 Policy categorically violates the Free Exercise Clause.**

As we have explained, "[a]lthough violations of the . . . Free Exercise Clause are generally analyzed in terms of strict scrutiny, where governmental bodies discriminate out of animus against particular religions, such decisions are plainly unconstitutional," regardless of any compelling interests advanced by the government.  *Ashaheed*, 7 F.4th at 1244 (internal quotation marks and alterations omitted).  That is because "government action motivated by religious animus cannot be 'narrowly tailored to advance' 'a compelling governmental interest.'"  *Id.* (quoting *Lukumi*, 508 U.S. at 531).  Accordingly, when the government "impose[s] regulations that are hostile to the religious beliefs of affected citizens" or "act[s] in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices," it is appropriate to "set aside" the regulation.  *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731–32 (2018).

The Does are likely to prove that the September 1 Policy was motivated by animus toward certain religions because the Policy passes judgment upon and presupposes the illegitimacy of certain religious beliefs.  The September 1 Policy discriminates on its face against "religious belief[s]" that are "opposed" to the

COVID-19 vaccine, but not necessarily "opposed to all immunizations."  App'x

Vol. V at 1123.  It also discriminates explicitly against religious practices that do not

have formal "teachings."  *Id.*[7]

Accordingly, the Administration implemented a policy of granting exemptions

for some religions, but not others.  The Administration made clear that it would "only

accept requests for religious exemption that cite to the official doctrine of an

organized religion . . . as announced by the leaders of that religion."  App'x Vol. V

at 1153.  An applicant whose religious beliefs departed from the "official doctrine" of

their religion would not qualify.  *Id.*  An applicant who did not adhere to "an

organized religion" would not qualify.  *Id.*  An applicant whose "religion" did not

have official "leaders" would not qualify.  *Id.*  An applicant whose religious

"leaders" did not publicly "announce[]" the religion's "official doctrine" with respect

to vaccines would not qualify.  *Id.*  In short, the Administration "passe[d] judgment

upon" and "presuppose[d] the illegitimacy of religious beliefs and practices" under

the September 1 Policy.  *Masterpiece Cakeshop*, 138 S. Ct. at 1731.

The Administration's discriminatory policy resulted in real-world

discrimination among religions.  *See* App'x Vol. V at 1129 ("Your exemption request

has been denied because it does not comply with the campus policy, which only

---

[7]  The partial dissent criticizes us for making "an appellate finding of fact" in concluding that there is animus here.  Dissent. Op. at 7.  But in applying the law to the facts of each case, appellate courts must sometimes evaluate the evidence in the record.  *See Kennedy*, 597 U.S. at 539–40.  And when the record admits no conclusion other than religious animus, we must say so.  *See Masterpiece Cakeshop*, 584 U.S. at 638.

recognizes religious exemptions based on a religious belief whose teachings are opposed to all immunizations."). For instance, the Administration's legal department was asked how the Administration would treat "Jehovah's Witnesses as an example," compared to practitioners of other religions who are "fully vaccinated against measles, mumps, etc. but want to say this vaccine violates their religious freedoms/rights." *Id.* at 1141. The Administration's counsel responded that "[p]ursuant to [the Administration's] policy the religious exemption applies to people whose religion precludes <u>all</u> vaccinations"—Jehovah's Witnesses, but not necessarily other sects. *Id.* Indeed, the Administration made clear that it would reject any applicant for a religious exemption unless her religion "teaches [her] and all other adherents that immunizations are forbidden under all circumstances." *Id.* at 1056. Therefore, the Administration refused to approve any exemptions for Buddhist applicants under the September 1 Policy. Nor would the Administration approve any exemptions for members of the Roman Catholic Church or the Eastern Orthodox Church. At the same time, the Administration admitted it would approve applications from practitioners of select, favored religions, such as Christian Scientists.

It is likely that the Does will be able to demonstrate that the September 1 Policy's discrimination against certain religions was motivated by animus. The record is replete with evidence of stereotypes about and prejudice toward certain religions and religious beliefs for being insufficiently "organized," insufficiently "official," or insufficiently "comprehensive" in the eyes of the Administration. The Administration "gave every appearance of adjudicating [the Does'] religious

30

objection[s] based on a negative normative 'evaluation of the particular justification' for [their] objection[s] and the religious grounds for [them]."  *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 537).  Regrettably, it "requires restating that government has no role in deciding or even suggesting whether the religious ground for [a] conscience-based objection is legitimate or illegitimate."  *Id.* Because the Administration assumed that impermissible role, the Does are likely to prevail on their Free Exercise claim.

ii.      **The September 1 Policy categorically violates the Establishment Clause.**

The "intrusive religious inquiry" that the Administration conducted here is also flatly barred by the Establishment Clause.  *Colo. Christian Univ.*, 534 F.3d at 1261 (capitalization omitted).  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).  Accordingly, the government may not "pick and choose" religions "on the basis of intrusive judgments regarding contested questions of religious belief or practice."  *Colo. Christian Univ.*, 534 F.3d at 1261. Such an inquiry violates the Establishment Clause's "prohibition of 'excessive entanglement' between religion and government," and is therefore "unconstitutional without further inquiry."  *Id.* at 1261, 1267 (quoting *Agostini v. Felton*, 521 U.S. 203, 232 (1997)).

In *Colorado Christian University*, we evaluated a Colorado statute that discriminated against students at some religious universities, but not others, by refusing the students scholarships.  534 F.3d at 1250.  We held that the statute

violated the Establishment Clause because it required "unconstitutionally intrusive scrutiny of religious belief and practice," and therefore evidenced "'excessive entanglement' between religion and government." *Id.* at 1250, 1261. Indeed, the statute was "fraught with entanglement problems." *Id.* at 1261. For instance, the statute required the government to evaluate whether any theology course offered by a university "tend[ed] to indoctrinate or [to] proselytize." *Id.* That forced the government "to decide how religious beliefs are derived" and to evaluate "the boundary between religious faith" and other beliefs. *Id.* at 1262. The statute at issue also asked government officials to evaluate individuals' "religious persuasion" and to assess whether, in the government's view, an individual belonged to one "particular religion" or to another. *Id.* at 1264.

As we held, none of that is constitutional. The Establishment Clause does not permit the "trolling through a person's . . . religious beliefs" required by the Colorado statute at issue in *Colorado Christian University*. 534 F.3d at 1261. Nor does it allow the sort of "governmental monitoring or second-guessing" of "religious beliefs and practices" that the state conducted. *Id.* Furthermore, by sorting individuals into different religious denominations and evaluating who counts as a member of "a particular religion" or "religious persuasion," the state acted as the "arbiter[] of scriptural interpretation." *Id.* at 1263–65. And "under the First Amendment, the government is not permitted to have an ecclesiology, or to second-guess the ecclesiology espoused by our citizens." *Id.* at 1265. Therefore, we held that Colorado's statute violated the Establishment Clause because it permitted the

government to impose its own ideas about which believers were valid members of which religious sects. *See id.* ("[T]he definition of who is a 'Christian' can generate an argument in serious circles across the country. . . . Similar questions plague the religious taxonomy of Jehovah's Witnesses, Christian Scientists, Unitarian-Universalists, various syncretistic groups and even (in some circles) the Roman Catholic Church.").

The September 1 Policy required a similarly intrusive inquiry into the validity of the Does' religious beliefs. It is evident that, under the September 1 Policy, the Administration rejected applicants' beliefs based not on their sincerity, but rather on their perceived validity. The Administration's official religious exemption form did not ask *whether* an applicant's sincerely-held religious belief prevented her from receiving the COVID-19 vaccine. It instead asked "why" an applicant's "sincerely held religious belief, practice, or observance prevents" her "from getting a COVID-19 vaccination." App'x Vol. V at 1147. The Administration also demanded that applicants explain whether they "had an influenza or other vaccine in the past," and justify how "this differ[s]." *Id.* The Administration further required an applicant for a religious exemption to "provide documentation that demonstrates that [her] religion is opposed to all immunizations." *Id.* at 1153. In response to the Administration's demands, some applicants submitted numerous pages of explanation of their religious beliefs, including deeply personal and private details about their religious journeys.

Nevertheless, if an applicant could not document an official religious doctrine to the Administration's satisfaction, Administration rejected the applicant's explanation of her own religious beliefs.  For instance, the Administration declared that, based on its own research, "it is 'morally acceptable' for Catholics to take vaccines against COVID-19."  App'x Vol. V at 1162.  As a result, the Administration decided that a Roman Catholic applicant's religious objection to the COVID-19 vaccine "does not constitute a religious belief, but a personal objection," because in the Administration's view, it is "of a personal nature and not part of a comprehensive system of religious beliefs."  *Id.* at 1162–63.

That is precisely the sort of religious entanglement the Establishment Clause proscribes.  As we have previously admonished the state of Colorado, "[i]t is not for the state to decide what Catholic—or evangelical, or Jewish—'policy' is."  *Colo. Christian Univ.*, 534 F.3d at 1263.  To avoid all doubt:  neither is it for the state to decide what "religious beliefs" must be held by Roman Catholics, or Buddhists, or Orthodox Christians, or anybody.  These are "question[s] of religious doctrine on which the State may take no position without entangling itself in an intrafaith dispute."  *Id.*

Under the September 1 Policy, the Administration conducted an intensive inquiry into applicants' religious beliefs; it sorted the applicants into religious sects; it pronounced the "official doctrine" of each sect; and it rejected applicants whose professed beliefs did not satisfy the Administration's theological litmus test.  That is "excessive entanglement," and it is among the Establishment Clause violations that

are "flatly forbidden without reference to the strength of governmental purposes." *Colo. Christian Univ.*, 534 F.3d at 1266.  For this reason alone, the Does are likely to prevail on their Establishment Clause claims.

> **b.    The Does are also likely to prevail because the September 1 Policy cannot survive heightened scrutiny.**

The Does are likely to prevail on their First Amendment claims for yet another reason:  the September 1 Policy fails strict scrutiny.  The district court abused its discretion in ruling otherwise.

> **i.    The September 1 Policy is neither neutral nor generally applicable.**

The September 1 Policy is subject to strict scrutiny because it is hostile toward and discriminatory against certain religions.  Government actions "incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. Philadelphia*, 141 S. Ct. 1868, 1876 (2021).  If a government policy "fail[s] either the neutrality or general applicability test," it "trigger[s] strict scrutiny." *Kennedy*, 142 S. Ct. at 2422. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877.  And a government law or policy "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* (internal quotation marks omitted).  The September 1 Policy was neither neutral nor generally applicable because it was overtly intolerant of certain religious beliefs, and because it invited

the Administration to evaluate the religious beliefs of employees and students on a case-by-case basis.

The September 1 Policy was explicitly non-neutral.  The First Amendment never permits the government to "discriminate in favor of some religions and against others."  *Colo. Christian Univ.*, 534 F.3d at 1260.  Therefore, "statutes involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny whether they arise under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause."  *Id.* at 1266 (citations omitted).  The September 1 Policy discriminated on the basis of religion because it "singled out" certain employees for better or worse treatment "precisely because" of the employees' religious beliefs.  *Shrum v. Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006).  If Jane Does 2 and 9 had been Christian Scientists, for instance, they would have been granted exemptions.  But because they were the wrong religions, their exemptions were denied.  Because the September 1 Policy discriminated "in favor of some religions and against others," it fails the neutrality test, and strict scrutiny applies.  *Colo. Christian Univ.*, 534 F.3d at 1260; *see Kennedy*, 142 S. Ct. at 2422.

Nor was the September 1 Policy generally applicable.  A government policy "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct."  *Fulton*, 141 S. Ct. at 1877 (alteration in original) (internal quotation marks omitted).  As we have explained, under the September 1 Policy, the Administration did not ask *whether* an applicant had a sincerely-held religious belief prohibiting her from receiving the COVID-19 vaccine.  Instead, the

Administration asked *why* the applicant held her religious beliefs, and it granted or denied exemptions on a case-by-case basis. The Administration "consider[ed] the particular reasons" underlying the applicant's religious beliefs and provided "individualized exemptions" to applicants whose religious beliefs, in the Administration's discretion, justified an exemption. *Id.* The September 1 Policy was in no way generally applicable. That, too, would be enough to "trigger[] strict scrutiny." *Kennedy*, 142 S. Ct. at 2422.

### ii. The September 1 Policy does not satisfy strict scrutiny.

The Administration cannot meet its burden to demonstrate that the September 1 Policy satisfies strict scrutiny. Because the Does have shown that the September 1 Policy is neither neutral nor generally applicable, this Court must "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 142 S. Ct. at 2422 (quoting *Lukumi*, 508 U.S. at 546). Indeed, "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546. And a government policy like the September 1 Policy "that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Carson ex rel. O.C. v. Makin*, 142 S. Ct. 1987, 1997 (2022) (alteration in original) (quoting *Lukumi*, 508 U.S. at 546).

"This is not one of them." *Carson*, 142 S. Ct. at 1997. Although "[s]temming the spread of COVID–19 is unquestionably a compelling interest," *Roman Cath.*

*Diocese of Brooklyn*, 141 S. Ct. at 67, the September 1 Policy is in no way tailored. An interest is not "drawn in narrow terms" if it is "overbroad or underinclusive in substantial respects." *Lukumi*, 508 U.S. at 546. The September 1 Policy is both. The Administration has not even attempted to explain why its interest is served by granting exemptions to practitioners of some religions, but not others. No one contends that Christian Scientists are any less likely to contract or to spread COVID-19 than Buddhists or Roman Catholics or Orthodox Christians. To paraphrase a prior opinion of this Court: the Administration's policy does not stop exemptions for religious beliefs; it stops only exemptions for religious beliefs the Administration deems inconsistent. *See Colo. Christian Univ.*, 534 F.3d at 1268. "This underinclusiveness undermines the defendants' claim of narrow tailoring." *Id.* There is simply no justification for the Administration's choice to tailor its policy to exclude some religions, but not others.

Indeed, the Administration gives up the game in this appeal. The Administration argued in its brief only that any controversy over the September 1 Policy was moot. The Administration did not contend that the September 1 Policy is neutral, nor generally applicable, nor narrowly tailored. As the Administration tacitly acknowledges, it is not any of those things. It is therefore highly likely the Does will succeed on the merits of the strict scrutiny analysis.

\* \* \*

The Administration's inquiries into the sincerity of the Does' religious beliefs were precisely the sort of "trolling through a person's . . . religious beliefs" for which

38

this Court and the Supreme Court have repeatedly admonished state actors. *Colo. Christian Univ.*, 534 F.3d at 1261 (quoting *Mitchell v. Helms*, 530 U.S. 793, 828 (2000)) (collecting cases).[8]  Much like the government in *Colorado Christian University*, the Administration placed itself "in the role of arbiter of [] essentially religious dispute[s]," *id.*, such as what constitutes the "teachings" of a particular religion.  *See* App'x Vol. I at 61.  And the Administration adjudicated such religious disputes in a manner that discriminated against some religions, but not others.  The Administration announced that it would approve exemptions for some favored religious applicants, such as Jehovah's Witnesses or Christian Scientists, but at the same time rejected other religious beliefs, stereotyping them as "personal," not "religious," and "not part of a comprehensive system of beliefs."  *See, e.g.*, App'x Vol. V at 1077–78.  The Administration's conduct under the September 1 Policy was precisely the sort of conduct prohibited by the First Amendment, as explained by Tenth Circuit and Supreme Court precedent.

Because the September 1 Policy so deeply violates the First and Fourteenth Amendments, and because the Administration's actions under the September 1 Policy

---

[8]  The partial dissent criticizes our reliance on *Colorado Christian University*, 534 F.3d at 1245, because the partial dissent views it as "an Establishment Clause case" that says nothing about the Free Exercise Clause.  Dissent. Op. at 16.  As our preceding discussion should make clear, we rely on *Colorado Christian University* primarily in our Establishment Clause analysis, not our Free Exercise analysis. Regardless, as we held in *Colorado Christian University*, the "very process of inquiry" into religious beliefs "may impinge on rights guaranteed by the Religion Clauses"—*both of them*—and thus "presents a significant risk that the First Amendment will be infringed" in one way or another.  534 F.3d at 1264 (quoting *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)).

are so clearly proscribed by our precedent, the Does are highly likely to succeed on the merits of their claims regarding the September 1 Policy.

>   **2.    The other factors weigh in favor of a preliminary injunction.**

The remaining factors weigh in favor of granting the Does a preliminary injunction of the September 1 Policy.

Because Jane Does 2 and 9 continue to suffer harm of a constitutional dimension, such harm is irreparable. The district court ruled that the Does had "failed to demonstrate a likelihood of success on their constitutional claims," and thus concluded that their "asserted harm is not of a constitutional dimension." We disagree, for the reasons stated above. And because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Jane Does 2 and 9 are likely to suffer irreparable harm absent a preliminary injunction. *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67.

Finally, the continuing harm alleged by the Does outweighs any harm to the public interest. As we have said before about state intrusions on religious liberty: "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. Accordingly, because the Does "have demonstrated a likely violation" of their constitutional rights, "an injunction would be in the public interest." *Hobby Lobby*, 723 F.3d at 1147; *see also id.* at 1147–48 (finding that where a plaintiff "remain[s] subject to the Hobson's choice between" financial ruin "or violating [her] religious beliefs . . . the balance of equities tips in" the plaintiff's favor).

**B.    The district court abused its discretion in failing to enjoin the September 24 Policy.**

The district court also abused its discretion in failing to enjoin the September 24 Policy. The district court was obligated by our precedents carefully to examine the Administration's motivations for the September 24 Policy, but it failed to do so. Because the September 24 Policy is tailored to reach precisely the same results as the unlawful September 1 Policy, the Does are likely to prevail in showing that the September 24 Policy is a product of discriminatory religious animus, not neutral motivations. Furthermore, because the September 24 Policy grants secular exemptions on more favorable terms than religious ones, it is not generally applicable on its face. It is therefore the Administration's burden to demonstrate why the September 24 Policy survives strict scrutiny. And it cannot. Thus, the district court abused its discretion in applying rational basis review and in concluding that the September 24 Policy survives judicial scrutiny.

**1.    Strict scrutiny applies to the September 24 Policy.**

The district court abused its discretion in failing to apply strict scrutiny to the September 24 Policy because the Policy is neither neutral nor generally applicable, and because the Does are likely to prove it is motivated by the same religious animus present in the September 1 Policy. "A rule that is discriminatorily motivated and applied is not a neutral rule." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004). And a government policy "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's

41

asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877.  For both reasons, the September 24 Policy is subject to strict scrutiny.  The district court abused its discretion and committed an error of law in applying rational basis review to the September 24 Policy.  *Tyson Foods*, 565 F.3d at 775.

### a.  The September 24 Policy is not neutral.

To determine whether the September 24 Policy is neutral, it is necessary under our precedents to examine the Administration's motivations for adopting it.  "Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral." *Shrum*, 449 F.3d at 1145.  Therefore, for a "conventional" First Amendment claim concerning a "polic[y] applied domestically," it is necessary to probe the sincerity of the government's justifications for the policy to evaluate whether they "were but pretexts for discriminating against" religion.  *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018); *see, e.g.*, *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 (10th Cir. 1998) (en banc) (examining "the selection of the person who is to recite the legislative body's invocational prayer" for "an impermissible motive").  The Does' claims are "conventional" ones, like "the typical suit involving religious displays or school prayer." *Trump*, 138 S. Ct. at 2418.  It was thus the district court's duty to "survey meticulously the circumstances" of the September 24 Policy "to eliminate, as it were, religious gerrymanders." *Lukumi*, 508 U.S. at 534 (internal quotation marks omitted).

The district court abused its discretion because it failed to conduct this meticulous review and, as a result, reached a clearly erroneous conclusion.  The

district court concluded that the September 24 Policy was not a pretext employed by the Administration to reach the same results as the unlawful September 1 Policy. The district court reasoned that "the fact that the [Administration] amended its policy while navigating a monthslong global pandemic does not show that its reasons for denying religious exemptions for students are pretextual." App'x Vol. VII at 1670. The district court then used its finding *for students* to deny relief to both students *and employees*, without undertaking any analysis of whether the policy for employees was similarly free of pretextual motives. Accordingly, the district court applied the wrong law when it failed properly to consider the factors indicating that the September 24 Policy for employees may be motivated by religious animus. "Factors relevant to the assessment of governmental neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question," and "contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (internal quotation marks omitted). When these factors are applied to the September 24 Policy, it is evident that the district court's conclusion was "manifestly unreasonable," and therefore an abuse of discretion. *Tyson Foods*, 565 F.3d at 775–76.

The historical background of the September 24 Policy demonstrates that the Policy was not neutral toward religion. The Administration adopted the September 24 Policy a mere twenty-three days after it adopted the hostile and discriminatory September 1 Policy. As recounted above, the Administration had a

pattern throughout August and September of making statements hostile toward particular religions. *See supra* at Part IV.A.1. The Administration changed policies on September 24, only after receiving notice of impending litigation. Instead of promptly reevaluating all employees immediately under the new, purportedly neutral policy, the Administration waited nearly three months to do so. Then, when the Administration finally reevaluated its employees under the September 24 Policy, it conducted the same sort of inquiry it had under the September 1 Policy to determine whether, in the Administration's view, "the request [wa]s made based on a sincerely-held religious belief," or whether it was based on beliefs the Administration deemed "personal" in nature. App'x Vol. VI at 1328–29; *compare id.*, *with* App'x Vol. V at 1077–78 (rejecting under the September 1 Policy exemptions for religious beliefs the Administration deemed "personal," not "religious," and "not part of a comprehensive system of beliefs").

It should be no surprise, then, that the Administration reached precisely the same results as it had reached under the old policy. Under the September 1 Policy, the Administration denied Jane Does 1, 3, 10, and 11 any exemption or accommodation. Under the September 24 Policy, the Administration denied Jane Does 1, 3, 10, and 11 any exemption or accommodation. Under the September 1 Policy, the Administration required Jane Does 4, 5, and 6 and John Does 3, 4, 5, and 7 to work remotely, and the Administration cut Jane Doe 5's pay by ten percent. Under the September 24 Policy, the Administration required Jane Does 4, 5, and 6

and John Does 3, 4, 5, and 7 to work remotely, and the Administration cut Jane

Doe 5's pay by ten percent.

It is manifestly unreasonable to think that the September 24 Policy would

reach precisely the same results as the September 1 Policy by accident. The

Administration had spent weeks or months drafting and implementing a policy

hostile toward and discriminatory against certain religions, only to adopt a new,

purportedly neutral policy that reached precisely the same results. Against the

backdrop of the Administration's recent "official expressions of hostility to religion,"

which the Administration has "not disavowed . . . at any point," the only reasonable

conclusion is that the September 24 Policy for employees was either selected or

applied to reach the same results as the September 1 Policy. *Masterpiece Cakeshop*,

138 S. Ct. at 1732. In other words, we "must draw the inference that [the Does']

religious objection[s] [were] not considered with the neutrality that the Free Exercise

Clause requires." *Id.* at 1731. The district court clearly erred in concluding

otherwise.

Because the September 24 Policy for employees was a mere pretext to

continue the Administration's September 1 Policy, it is subject to strict scrutiny.

Rational basis review is available only for a "neutral rule of general applicability,"

which "[a] rule that is discriminatorily motivated and applied is not." *Axson-Flynn*,

356 F.3d at 1294; *see also Shrum*, 449 F.3d at 1145 ("Proof of hostility or

discriminatory motivation may be sufficient to prove that a challenged governmental

action is not neutral."). Accordingly, the September 24 Policy "is subject to strict

45

scrutiny, and [its] burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest." *Axson-Flynn*, 356 F.3d at 1294 (internal quotation marks omitted).

### b.    The September 24 Policy is not generally applicable.

The September 24 Policy is not generally applicable because it grants secular exemptions on more favorable terms than religious exemptions. Relying on out-of-circuit precedent and a now-overruled decision of our Court, the district court concluded that the September 24 Policy does not selectively burden or target religious conduct over secular conduct, and therefore that it was generally applicable. Our precedents dictate otherwise. When a Policy makes a "value judgment in favor of secular motivations, but not religious motivations," it is not generally applicable. *Grace United Methodist Church v. Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006) (quoting *Fraternal Ord. of Police Newark Lodge No. 12 v. Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.)). Therefore, a government policy that grants an exemption "for medical reasons" but denies the same exemption "for religious reasons" is not generally applicable, as it "devalues religious reasons . . . by judging them to be of lesser import than nonreligious reasons." *Grace United Methodist Church*, 451 F.3d at 654 (quoting *Lukumi*, 508 U.S. at 537–38) (citing *Fraternal Ord. of Police Newark Lodge No. 12*, 170 F.3d at 364–66).

The September 24 Policy on its face makes a value judgment in favor of secular motivations because it has a lower bar for denying religious exemptions. The September 24 Policy denies a secular medical exemption if it "poses a direct threat to

the health or safety" of others.  App'x Vol. V at 1255.  But a religious exemption is

denied under the Policy even if the exemption does not rise to the level of "direct

threat."  The Administration denies a religious exemption under the September 24

Policy if it merely "unduly burden[s] the health and safety of other individuals."  *Id.*

at 1256 (capitalization omitted).  Because the September 24 Policy has a lower

threshold for denying religious exemptions, it makes a "value judgment in favor of

secular motivations, but not religious motivations."  *Grace United Methodist Church*,

451 F.3d at 654 (quoting *Fraternal Ord. of Police Newark Lodge No. 12*, 170 F.3d

at 365).  Accordingly, it is not generally applicable, and it is subject to strict scrutiny.

*See Grace United Methodist Church*, 451 F.3d at 654; *Fraternal Ord. of Police*

*Newark Lodge No. 12*, 170 F.3d at 364–66.[9]

---

[9] The partial dissent correctly notes that a medical exemption may also be denied if it
"poses an undue hardship."  Dissent. Op. at 25 (quoting App'x Vol. V at 1255–56).
The partial dissent would hold that such language is "essentially the same" as the
"unduly burden the health and safety of other individuals" language relevant to
religious exemptions.  *See id.*  Maybe in a vacuum, but not in context.  It is clear that
the September 24 Policy borrows from our Americans with Disabilities Act cases,
which hold that an employer need not grant an accommodation when to do so would
pose an undue hardship.  *See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260,
1267 (10th Cir. 2015).  That "undue hardship" must be one borne by the employer *as
a whole*.  *See id.*; *accord Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (holding that
"'undue hardship' is shown when a burden is substantial in the overall context of an
employer's business," not when it simply has effects on other employees).  Thus, on
one hand, a medical exemption may be denied only if such exemption would pose a
substantial hardship on the whole hospital system or directly threaten an individual.
On the other hand, a religious exemption may be denied if it would merely impose an
undue burden on another individual.  That constitutes a lower threshold for denying
religious exemptions.

### 2.    The September 24 Policy fails strict scrutiny.

The Administration has not met its burden to show that the September 24 Policy for employees can survive "the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546. A policy that is tailored specifically to target religious conduct is not narrowly tailored. *See id.* at 534–44. As the September 24 Policy has been applied to exclude precisely the same employees as the discriminatory September 1 Policy, it was evidently tailored to target the same religious conduct. *See supra* at Part IV.B.1.a.

Even setting that aside, the Administration failed to meet its burden to show the September 24 Policy is narrowly tailored. The Administration offers two sentences in support of its claim that the September 24 Policy is narrowly tailored to the compelling interest of reducing the spread of COVID-19, but its reasoning withers upon examination. According to the Administration, "[l]imiting in-person contact to vaccinated individuals is narrowly tailored to the Anschutz Campus' compelling interest because employees and students have a greater risk of contracting and spreading COVID-19 if they interact with unvaccinated patients, coworkers, and classmates." Aple. Br. at 41–42. But the narrow tailoring analysis requires explaining why the interest identified—abating the "greater risk" for individuals who must be present in-person on the Anschutz Campus—cannot "be achieved by narrower ordinances that burden[] religion to a far lesser degree." *Lukumi*, 508 U.S. at 546.

Because the Administration's explanation of its narrow tailoring is entirely conclusory, the Administration has not met its burden. The Administration does not explain how much "greater" the risk is; or why the denial of religious exemptions is the only way to reduce the risk; or why unvaccinated Anschutz employees pose more of a risk than other unvaccinated patients, coworkers, or classmates. What about unvaccinated employees of other institutions who interact with Anschutz employees on other campuses? What about employees of Anschutz who work elsewhere, and whose jobs never require them to set foot on the Anschutz Campus? Why does the September 24 Policy apply to them, and how is that narrowly tailored to the interest of protecting the Anschutz Campus? The Administration did not even attempt to answer any of these questions. The September 24 Policy is both over- and under-inclusive in ways that the Administration cannot explain—or at least, in ways that it did not explain. The unavoidable conclusion is that the September 24 Policy is not narrowly tailored to its purported ends. The September 24 Policy fails strict scrutiny.

As with the September 1 Policy, the Does are likely to prevail on their claims regarding the September 24 Policy. The other factors also weigh in favor of a preliminary injunction. "The loss of First Amendment freedoms" under the September 24 Policy "unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67. Likewise, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. Accordingly, the district court abused its discretion by failing to grant the Does a preliminary injunction.

## V.        The partial dissent's arguments are unpersuasive.

The partial dissent disagrees with parts of our reasoning and with our conclusion that the Does are likely to succeed on the merits with respect to the September 24 Policy for employees.  But before addressing such disagreements, let us first emphasize the points of agreement.  The partial dissent agrees that the Does have standing, that this case is non-moot as to employees, and that we must therefore reach the merits concerning both the September 1 Policy and the September 24 Policy for employees.  Dissent. Op. at 1; *see supra* at Part III.  The partial dissent also agrees that the September 1 Policy discriminated in favor of organized religions that oppose all immunizations, and against employees who do not belong to such religions.  Dissent. Op. at 3.  The partial dissent further agrees that such discrimination likely violated the rights guaranteed by the Free Exercise Clause, and that the Administration has not yet demonstrated that the September 1 Policy satisfies strict scrutiny.  *Id.* at 5–6.  Accordingly, the partial dissent agrees that the Does are likely to prevail with respect to the September 1 Policy.  *Id.* at 6–7.  Furthermore, the partial dissent agrees that the continuing irreparable constitutional harm to the Does outweighs any interest the public has in the enforcement of the unconstitutional September 1 Policy.  *Id.* at 19.  Finally, the partial dissent agrees that a government policy is not generally applicable if it grants secular medical exemptions on more favorable terms than religious exemptions.  *See id.* at 24–26.

The partial dissent parts ways with our analysis when it comes to the Administration's animus toward certain religious beliefs.  The partial dissent reaches

50

the wrong conclusions in part because it begins with a grave misunderstanding of the context of this case. The partial dissent argues that "[t]he starting point for analyzing the constitutionality of this mandate is well-established Supreme Court case law upholding vaccine mandates that do not provide <u>any</u> religious exemptions." Dissent. Op. at 3. As the partial dissent sees it, the fact that the Administration "decided to provide a religious exemption" at all "itself suggests solicitude, not animus, toward religious believers." *Id.* at 5. That is entirely backwards.

Unlike the defendants in cases relied upon by the partial dissent, the Administration in this case was required to provide a religious exemption. The Administration is an employer subject to Title VII of the Civil Rights Act of 1964, which "requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship on the conduct of the employer's business.'" *Groff*, 600 U.S. at 454 (2023). Thus, although "the First Amendment likely does not require any religious accommodations whatsoever to neutral and generally applicable laws," a government employer such as the Administration must still provide religious accommodations under Title VII, and "must abide by the First Amendment" in doing so. *Kane v. de Blasio*, 19 F.4th 152, 168–69 (2d Cir. 2021) (per curiam). The partial dissent relies on an array of cases that simply do not concern employer-employee relationships subject to Title VII.[10] By comparing this

---

[10] *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (dicta) (children); *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 12 (1905) (all inhabitants of a town); *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood*

case to such inapposite cases, the partial dissent begins at entirely the wrong "starting point." *See* Dissent. Op. at 3.

The partial dissent's incorrect framing of the issue permeates its analysis. It relies on its conclusion that the Administration "adopted the [vaccine] mandate . . . to protect the health and safety of its staff, students, and patients during the ongoing global pandemic," not "to suppress religion." Dissent. Op. at 13. But the Administration's motivation for the mandate itself is irrelevant. The mandate is not at issue in this case. What matters is how—and why—the Administration implemented the religious accommodations required by Title VII.

If the partial dissent had started at the right point, it would have reached the right destination. The September 1 Policy does not suggest "solicitude" toward religious believers, as the partial dissent suggests, because it is not a benefit for believers above and beyond what is required. *Contra* Dissent. Op. at 5. Instead, the September 1 Policy falls far below the requirements of Title VII, denying its protections to the vast majority of religious believers, and providing such benefits only to a select few with favored religious beliefs. In this context, it is clear that the Administration was trying to evade its Title VII obligations by denying

*Dev.*, 76 F.4th 130, 135 (2d Cir. 2023) (students and daycare children); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1175 (9th Cir. 2021) (students); *Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 84 (E.D.N.Y. 1987) (schoolchildren); *Mosier v. Maynard*, 937 F.2d 1521, 1522 (10th Cir. 1991) (prison inmates); *cf. We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 274 (2d Cir.), *opinion clarified,* 17 F.4th 368 (2d Cir. 2021) (government acting as regulator, not employer).

accommodations to many believers based on their religious views. This evidences a hostility toward religious believers, not a solicitude.

The partial dissent argues that there is "no evidence of actual animus" in this case because the Administration did not issue official statements with the same sort of egregious language present in cases like *Masterpiece Cakeshop*. Dissent. Op. at 10–13 (citing *Masterpiece Cakeshop*, 584 U.S. 617). True, unlike the government officials involved with *Masterpiece Cakeshop*, the Administration did not publicly associate the Does' beliefs with "slavery" or "the Holocaust." *See Masterpiece Cakeshop*, 584 U.S. at 635. But if that is the bar for an inference of hostility, it will almost never be cleared, even in most cases of egregious discriminatory animus.

The Supreme Court's opinion in *Masterpiece Cakeshop* identifies two different sorts of religious disparagement, at least one of which is present in this case. As the Supreme Court explained, "[t]o describe a man's faith as 'one of the most despicable pieces of rhetoric that people can use,'" as the government did in *Masterpiece Cakeshop*, "is to disparage his religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere." 584 U.S. at 635. Based on the record now before us, it appears the Administration did not disparage religion in the first way; that is, it did not describe Roman Catholic or Buddhist views as "despicable." But it adopted an official policy that explicitly disparaged such religious views in the *second* way. The Administration made the core constitutional error of deeming certain religious views to be *per se* insincere and thus disparaging such views in its official policy.

53

Regrettably, the partial dissent repeats that very same error. The partial dissent argues that the Administration "was entitled to ask applicants why they opposed being vaccinated." Dissent. Op. at 1. At a high enough level of abstraction, that sounds right—better stated, the Administration was entitled to ask applicants *whether* they opposed being vaccinated *for religious reasons*, rather than secular ones. But an employee could answer that question with little more than "yes" or "no." The *why* sought by the Administration, and endorsed by the partial dissent, transgressed all boundaries set by the Religion Clauses. The Administration was not entitled to demand a further explanation about the mechanics of employees' religious doctrines, or to ask employees to detail why their religious beliefs proscribe receipt of a COVID-19 vaccine, or to require employees to justify the differences between their past religious views on other vaccines and their current religious views on COVID-19 vaccines. But that is precisely what the Administration did. *See* App'x Vol. V at 1147. The partial dissent would permit such intrusive inquiries under the guise of "determin[ing] whether the applicant's religious belief underlying the exemption request was sincerely held." Dissent. Op. at 15. But to "characterize[e]" someone's religious beliefs as "merely rhetorical—something insubstantial and even insincere" is "to disparage his [or her] religion." *Masterpiece Cakeshop*, 584 U.S. at 635.

## VI.    Conclusion

It is "clearly established that non-neutral state action imposing a substantial burden on the exercise of religion violates the First Amendment." *Shrum*, 449 F.3d

at 1145.  The Administration's September 1 Policy is not neutral on its face; the

September 24 Policy is not neutral in practice; and both substantially burden the

Does' exercise of religion.  Because the Does' ongoing, irreparable First and

Fourteenth Amendment injuries outweigh any public interest against a preliminary

injunction, the district court abused its discretion in failing to grant the Does' motion.

REVERSED.

<u>Doe v. Board of Regents of the University of Colorado</u>, Nos. 21-1414, 22-1027

**EBEL**, J., concurring in part, dissenting in part.


I agree that we can address the merits of the district court's order denying the <u>employee</u> Plaintiffs' motion for a preliminary injunction to enjoin both COVID vaccine mandates adopted by the University of Colorado's Anschutz Campus ("University"). Like the majority, I agree the September 1 mandate should be enjoined preliminarily, although for reasons different from those relied upon by the majority. However, I would not enjoin the September 24 mandate. Thus, I would affirm in part and reverse in part the district court's order.

I write separately to explain, in particular, two primary disagreements with the majority's analysis. First, I see no evidence indicating that the University adopted either mandate out of an animus—that is, a hostility—toward religion generally or toward some religions in particular. Second, Plaintiffs have not shown that the two inquiries the University posed to those applying for a religious exemption under the September 1 mandate infringed any First Amendment protection. The University was entitled to ask applicants why they opposed being vaccinated in order to determine whether that opposition was based on religious beliefs and, if so, whether those religious beliefs were sincerely held and, if so, how those beliefs could be accommodated.

**I. September 1 mandate**

Our review necessarily focuses on the record that was before the district court at the time it made the challenged decisions not to enjoin either mandate. <u>See</u> <u>N.M. Dep't</u>

of Game & Fish v. U.S. Dep't of Interior, 854 F.3d 1236, 1240 n.1 (10th Cir. 2017).  That

point of reference transports us from our current relative safety of a world returning to

normal and returns us into the midst of the surging and unfamiliar COVID-19 global

pandemic.

At the time the University adopted the September 1, 2021, mandate—more than a

year and a half into that global pandemic—COVID-19 cases in Colorado were surging

and hospitalizations were increasing.  Hospitalizations and COVID deaths were predicted

to continue to rise through late November 2021.  In response, the University's Anschutz

Campus—which includes several hospitals and multiple health care schools and whose

employees work in health care facilities throughout the state serving approximately

2.1 million patients each year—adopted its September 1 COVID vaccination mandate.

The purpose of the mandate was

> to protect the health and safety of the University of Colorado Anschutz
> Medical Campus ("CU Anschutz") community, including all faculty, staff,
> students, badged affiliates, persons of interest (POIs), visitors, and volunteers
> ("Individuals") who work or learn on the Anschutz Medical Campus or off
> campus in connection with CU Anschutz programs.

(Aplt. App. 1121.)  The mandate required

> all Individuals who currently or may in the future access any CU Anschutz
> facility or participate in any CU Anschutz program, or whose employment
> or academic activities may require in-person interaction with other CU
> Anschutz employees, students, patients, study subjects, or members of the
> public, regardless of location to become fully vaccinated against COVID-19
> . . . , subject to limited exceptions and exemptions.

(Id.)

> Positions or programs that require on-campus presence or interaction with
> others will not be allowed to be performed remotely in order to avoid

2

> compliance with this Policy.  However, Individuals who hold positions that
> have been previously approved by a supervisor as being 100% remote
> without current or future presence at <u>any</u> CU Anschutz facility (owned or
> leased) or participation in any Anschutz program, or whose employment or
> academic activities do not require in-person interaction with other CU
> Anschutz employees, students, patients or study subjects of the Anschutz
> Medical campus, regardless of location, are not required to . . . comply with
> this policy.

(<u>Id.</u> at 1122–23.)

The mandate provided for exemptions "for medical or religious reasons."  (<u>Id.</u> at

1123.)  Most relevant here, "[a] religious exemption may be submitted based on a

person's religious belief whose teachings are opposed to all immunizations."  (<u>Id.</u>)  A

University official explained that this meant that only members of religions which

opposed all immunizations, like Christian Scientists, could obtain a religious exemption.

The starting point for analyzing the constitutionality of this mandate is

well-established Supreme Court case law upholding vaccine mandates that do not provide

<u>any</u> religious exemptions.  <u>See</u> <u>Prince v. Massachusetts</u>, 321 U.S. 158, 166 & n.12 (1944)

(stating that a person "cannot claim freedom from compulsory vaccination . . . on

religious grounds," citing <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905), which upheld

requirement that all adults in Cambridge, Massachusetts, be vaccinated against

smallpox)); <u>id.</u> at 166–67 ("The right to practice religion freely does not include liberty to

expose the community or [a] child to communicable disease or the latter to ill health or

death.").[1]

---

[1] <u>See also</u> <u>We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.</u>, 76 F.4th
130, 135–36 (2d Cir. 2023) (holding Connecticut's repeal of religious exemptions to
vaccination requirements for schools and childcare programs did not violate Free

That well-established case law is premised on the legal principle that a law that is both neutral toward religion and generally applicable is constitutional if it is rationally related to a government interest, even if the law incidentally burdens religion.  See Fulton v. City of Philadelphia, 593 U.S. 522, 533 (2021) (citing Employment Div. v. Smith, 494 U.S. 872, 878–82 (1990)); see also We the Patriots, 76 F.4th at 144-45 (2d Cir.).  See generally Wisconsin v. Yoder, 406 U.S. 205, 215–16 (1972) ("[T]he very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests.").

The majority states that the dissent errs in focusing on First Amendment cases instead of Title VII precedent.  But there are no Title VII claims at issue in this case.  Plaintiffs allege, instead, that the University's vaccine mandates violate the First Amendment.  And the preliminary injunction Plaintiffs sought would have required the University to enforce its vaccine mandates in compliance with the First Amendment.  The dissent's reliance on First Amendment case law is, then, appropriate.

---

Exercise Clause; citing "nearly unanimous" case law from other courts rejecting constitutional challenge to vaccine mandates providing no religious exemptions), pet. for cert. filed, (U.S. Dec. 14, 2023) (No. 23-643); Doe v. San Diego Unified Sch. Dist., 19 F.4th 1173, 1175–81 (9th Cir. 2021) (holding Plaintiff students failed to show likelihood that school district's student vaccine mandate, which included medical and other exemptions, but not religious exemptions, violated Free Exercise Clause); We the Patriots USA, Inc. v. Hochul, 17 F.4th 266, 272, 290 (2d Cir. 2021) (per curiam) (holding plaintiffs had not established likelihood that vaccine mandate for healthcare workers that included medical, but not religious, exemptions violated Free Exercise Clause), clarified on other grounds by 17 F.4th 36 (2d Cir. 2021) (per curiam).

Here, the University decided to provide a religious exemption, which itself suggests solicitude, not animus, toward religious believers. See We the Patriots, 76 F.4th at 148–49, 156 (2d Cir.). The University is required to provide those religious exemptions in a constitutional manner. See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist., 672 F. Supp. 81, 88 (E.D.N.Y. 1987). The criteria by which the University's September 1 mandate made those religious exemptions available—only to members of organized religions that officially opposed all immunizations—was constitutionally ill-conceived.

That criteria likely violated the First Amendment's Free Exercise Clause because it favored employees who belonged to an organized religion that opposed all vaccines over employees with sincerely held religious beliefs against COVID vaccinations who did not belong to any organized religion, see Frazee v. Ill. Dep't of Employment Sec., 489 U.S. 829, 833–34 (1989), or who belonged to a religious group that opposed COVID vaccines but not all vaccines as part of its beliefs. Further, that criteria disfavored individuals who, despite sincerely held religious objections to all vaccines, belonged to organized religions which did not officially oppose any vaccines. See Mosier v. Maynard, 937 F.2d 1521, 1523 (10th Cir. 1991) (stating "a religious objection may arise from a 'specific [religious] belief, whether as part of a personal faith or as a tenet of an organized group or sect'" (quoting Dunn v. White, 880 F.2d 1188, 1197–98 (10th Cir. 1989) (per curiam)); see also LaFevers v. Saffle, 936 F.2d 1117, 1119 (10th Cir. 1991); Kane v. de Blasio, 19 F.4th 152, 168–69 (2d Cir. 2021) (per curiam).

We might, nevertheless, uphold the mandate's constitutionally suspect criteria for granting religious exemptions if that criteria could pass strict scrutiny; that is, if the University could show that this criteria for affording religious exemptions was narrowly tailored to serve a compelling government interest.  See Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1266 (10th Cir. 2008) (stating that Free Exercise violations "are generally analyzed in terms of strict scrutiny, under which discrimination can be justified only if it is narrowly tailored to achieve a compelling state interest"); Kane, 19 F.4th at 168–69 (2d Cir.); see also Awad v. Ziriax, 670 F.3d 1111, 1129 (10th Cir. 2012) (holding that once party moving for preliminary injunction establishes substantial likelihood that challenged government rule violates First Amendment, burden shifts to Government to show challenged rule survives strict scrutiny).  But I agree with the majority that it is unlikely that the University could make such a showing.

That is all we need in this case to conclude that Plaintiffs have shown they likely will prevail on their First Amendment challenge to the September 1 mandate.[2]  The majority, however, concludes that the September 1 mandate is unconstitutional for

---

[2] The majority further concludes that the September 1 mandate's criteria for religious exemptions also violated the First Amendment's Establishment Clause because, among other reasons, it favored some religious denominations over others.  See Larson v. Valente, 456 U.S 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); see also Colo. Christian, 534 F.3d at 1257.  But Plaintiffs did not assert on appeal that a preliminary injunction is warranted on the basis of an alleged Establishment Clause violation.  Nor did they place much emphasis on the Establishment Clause in moving for a preliminary injunction in the district court.  In any event, we do not need to reach the Establishment Clause question in order to conclude the September 1 mandate is likely unconstitutional.

different reasons, reasons with which I disagree and which are unnecessary to the majority's disapproval of the September 1 mandate.

### A. There is no evidence that the University adopted its September 1 mandate out of an animus—that is, actual hostility—toward religion generally, or toward some religions specifically

The majority concludes that the September 1 mandate violated the Free Exercise Clause because the University adopted it out of an animus against "certain religions," "religious belief[s] that are opposed to the COVID-19 vaccine, but not necessarily opposed to all immunizations," and "religious practices that do not have formal teachings." (Op. at 28–29 (internal quotation marks omitted).) I disagree that the record before us supports a finding of such animus—particularly as an appellate finding of fact. This court has distinguished between discriminating against certain religions—that is, intentionally treating some religions more favorably than other religions, which the September 1 mandate surely did—and acting with animus, or actual hostility, toward some or even all religions, which this record does not support. See Ashaheed v. Currington, 7 F.4th 1236, 1244 n.3 (10th Cir. 2021). "Intentional discrimination involves an intent to treat a group differently. Animus is hostility toward a group." Id. "Intentional religious discrimination can but need not include animus or hostility toward religion." Id. (citing Shrum v. City of Coweta, 449 F.3d 1132, 1145 (10th Cir. 2006), and Janny v. Gamez, 8 F.4th 883, 911–13 (10th Cir. 2021)). See generally Murray v. UBS Secs., LLC, 144 S. Ct. 445, 448–49, 453 (2024) (in applying Sarbanes-Oxley Act's anti-retaliation provision, drawing distinction between "discriminate," meaning to treat individuals differently, and an "animus-like 'retaliatory intent'").

There are several problems with the majority's finding that the University acted with religious animus. As a procedural matter, the existence of religious animus is a fact question that we would ordinarily review for clear error. See Ashaheed, 7 F.4th at 1244; see also M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health, 53 F.4th 29, 32, 36–38 (2d Cir. 2022). But in this case the district court made no factual finding on whether the University acted with an anti-religion animus because the district court (incorrectly, we have now concluded) deemed Plaintiffs' requests to enjoin the September 1 mandate to be moot. It is the majority, then, on appeal from that mootness decision, that makes the initial factual finding that the University acted with animus against some religions when it adopted the September 1 mandate. Fact-finding, however, is not an appellate court's role. See Joseph A. ex rel. Wolfe v. N.M. Dep't of Human Servs., 69 F.3d 1081, 1089 (10th Cir. 1995).

Moreover, there is simply no evidence in the record to support the majority's factual finding that the University acted with animus—that is, actual hostility—against some religions when it adopted and applied the September 1 mandate. The majority does not specifically identify any such evidence and, having reviewed the entire record, I have found none. Nor have Plaintiffs themselves pointed to any evidence of animus. When Plaintiffs do briefly mention religious animus or hostility in their pleadings, Plaintiffs simply link those conclusions to their own unsupported and conclusory assertion that the September 1 mandate is "blatantly discriminatory." (Aplt. App. 1410.[3])

---

[3] See also Aplt. App. 975 (stating that "John Doe 6 was . . . subject to overt religious hostility," apparently because the University denied him a religious exemption, telling

That appears to be what the majority is relying upon as well.  The majority's finding of animus focuses on the September 1 mandate's "discriminat[ing] . . . against 'religious belief[s]' that are 'opposed' to the COVID-19 vaccine, but not necessarily 'opposed to all immunizations,'" and "against religious practices that do not have formal 'teachings.'"  (Op. at 28–29 (quoting Aplt. App. 1123).)  The opinion states:

> It is likely that the Does will be able to demonstrate that the September 1 Policy's discrimination against certain religions was motivated by animus. The record is replete with evidence of stereotypes about and prejudice toward certain religions and religious beliefs for being insufficiently "organized," insufficiently "official," or insufficiently "comprehensive" in the eyes of the [University].

(Id. at 31.)  However, the majority's conclusion rests on the fact that the September 1 mandate treated members of organized religions that officially oppose all vaccinations differently—more favorably—than religious-exemption applicants who did not belong to any organized religion or who were members of a religion whose religious objections to vaccines are narrowly directed only to COVID vaccines and not to all vaccines. Although this differing treatment is unconstitutional, it could be explained, and on this record is likely to be explained, by an innocent, but erroneous, effort to draft a policy that

---

him that only members of religions that oppose all immunizations are exempted and his belief opposing COVID-19 vaccinations "is 'not part of a comprehensive system of religious beliefs'"); cf. Aplt. Reply Br. 18–19 (asserting, without further explanation, that "Defendants have not come close to eliminating the 'even slight suspicion' that the September 24 Policy's prohibition of Plaintiffs' requested exemptions continues to 'stem from animosity to religion or distrust of its practices' (i.e., of Plaintiffs' religious objections to COVID vaccination)." (quoting Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n, 584 U.S. 617, 638–39, 138 S. Ct. 1719, 1731 (2018)).  Among other defects, Plaintiffs' last conclusory and factually unsupported assertion seems wrongly to put the burden on the University to disprove a religious animus.

casts scrutiny narrowly upon the COVID issue rather than more generally upon a broad vaccine issue. I believe it is imprudent, and beyond the current record, for our court at this interlocutory stage to make emphatic and unsupported findings of animus when it is quite possible that the University was just trying to draft a narrow policy addressing a very specific risk in order to keep its patients and staff free from a preventable COVID risk at a time of great urgency and uncertainty when COVID was killing so many people receiving medical care.

Because there is no evidence of actual animus, the majority erroneously conflates the University's decision to deny Plaintiffs' requests for religious exemptions, based upon the University's constitutionally misguided criteria, with a judgment that the University determined that Plaintiffs' religious beliefs are illegitimate generally. That seems harsh and beyond the preliminary record before us.

The University likely did unconstitutionally discriminate against—that is, treat less favorably—some religions and some employees with sincere religious beliefs who do not belong to an official religion or who oppose just COVID-19 vaccines. But, by itself, that differing treatment is not evidence of an actual hostility toward some religions and religious beliefs. See Ashaheed, 7 F.4th at 1244 n.3. Neither Plaintiffs nor the majority have identified any evidence that the University acted with actual hostility toward some religions, or religion generally.

The cases on which the majority relies to support its erroneous finding of animus are distinguishable, addressing situations very different from the one presented here. Masterpiece Cakeshop, for example, involved the manner in which a state administrative

10

board adjudicated a claim that a bakery owner, Jack Phillips, had illegally refused to make a wedding cake for a same-sex couple. 584 U.S. at 621–22, 626. In his defense, Phillips asserted that making a cake for a same-sex wedding would be contrary to his religious beliefs. Id. at 621, 630. The Supreme Court held that the seven-member Colorado Civil Rights Commission, in ruling for the couple, had acted with "a clear and impermissible hostility toward [the baker's] sincere religious beliefs." Id. at 634; see also id. at 637–38. However, the Court based that determination on explicit statements made by several commission members, id. at 634–36, including one member who stated, without objection from other members, that

> [f]reedom of religion and religion has [sic] been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the holocaust . . . . And to me it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others.

Id. at 635 (quoting hrg. tr. at 11–12).

The Court also noted that the Commission's decision in that case differed from the Commission's treatment of "cases of other bakers who objected to a requested cake on the basis of conscience and [who] prevailed before the Commission." Id. at 636; see also id. at 636–38. In those other cases, the Colorado Civil Rights Division, which addressed civil rights complaints in the first instance before the Commission considered them, see id. at 628, had ruled in favor of three bakers who refused "to create cakes with images that conveyed disapproval of same-sex marriage, along with religious text," because the bakers in those cases deemed the message to be derogatory, hateful, or discriminatory. Id. at 636–37. But the Commission, in rejecting Phillips' assertion that the requested

message violated his religious beliefs, employed differing reasoning, telling Phillips that the requested message was not his, but that of his customer.  Id. at 637.

Under those circumstances, the Supreme Court concluded that "the Commission's treatment of [the baker's] case violated the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint."  Id. at 638.

Different than Masterpiece Cakeshop, the majority here has not identified any similar evidence of animus.  There are, for example, no official University statements expressing hostility toward certain religions.  See Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 525 n.1 (2022) (stating a plaintiff can "prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise" (quoting Masterpiece Cakeshop, 584 U.S. at 639).  The only official University statements that the majority identifies are its statements simply denying Plaintiffs' requests for religious exemptions because they are not members of an organized religion that officially opposes all immunizations.

The majority also relies on the Tenth Circuit's decision in Ashaheed, which involved the Colorado Department of Corrections ("CDOC") policy prohibiting inmates from having beards.  7 F.4th at 1240.  That policy provided religious exemptions for inmates who wear beards for religious reasons.  Id.  In fact, the CDOC had previously allowed Ashaheed a religious exemption from the no-beard policy because he wore a beard pursuant to his Muslim beliefs.  Id. at 1241.  The Tenth Circuit held that Ashaheed's allegation that one particular CDOC guard, nevertheless, made him shave his beard because of the guard's animus against Muslims, id. at 1241–43, was sufficient to

12

state a Free Exercise claim against that guard at the motion-to-dismiss stage of litigation, id. at 1242–46. Plaintiffs in this case, however, do not allege that any University official denied a religious exemption contrary to the September 1 mandate because of that particular official's animus against members of some religions.

The majority also cites to Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, a Supreme Court case involving the City's response to a decision by adherents of the Santeria religion—which conducts animal sacrifices as part of its rituals—to locate a house of worship in the City. 508 U.S. 520, 524–26 (1993). In response, the City Council enacted a series of resolutions and ordinances opposing ritual animal sacrifice and deeming animal sacrifices to violate the State's animal cruelty law. Id. at 526–28. The Supreme Court held that those enactments violated the Free Exercise Clause because their object was specifically to suppress the Santeria religion. Id. at 531, 542.

The situation here is much different. There is no indication that the University adopted the September 1 mandate in order to suppress religion, or at least religions that do not oppose all immunizations. Every indication is that the University adopted the mandate, instead, to protect the health and safety of its staff, students, and patients during the ongoing global pandemic. In a misguided effort to provide limited exemptions from its vaccine mandate, the University ended up unconstitutionally favoring members of organized religions that officially opposed all immunizations over all other religions and religious believers. But that constitutional violation standing alone, without more, is not enough to establish further that the University was acting with animus against—an actual hostility toward—other religions or those who did not belong to one of those favored

13

religions. The majority opinion would eliminate animus as a separate issue and instead find animus any time the challenged policy violated the Free Exercise Clause. <u>See Ashaheed</u>, 7 F.4th at 1244 n.3; <u>cf.</u> <u>Janny</u>, 8 F.4th at 912 ("'[T]he Free Exercise Clause is not limited to acts motivated by overt religious hostility or prejudice,' and has therefore 'been applied numerous times when government officials interfered with religious exercise not out of hostility or prejudice, but for secular reasons.'" (quoting <u>Shrum</u>, 449 F.3d at 1144).

For these reasons, I cannot agree with the majority that Plaintiffs have shown that it is likely that the University violated the Free Exercise Clause by acting with an animus against certain religions or religious beliefs. Nor do we need to make such a finding in order to conclude that the University's September 1 mandate likely violated the First Amendment.

### B. The University's questions posed to religious-exemption applicants under the September 1 mandate were not unconstitutional

The majority also concludes that the University's September 1 mandate violates the Establishment Clause of the First Amendment, based on what the majority refers to as an "intrusive" inquiry into Plaintiffs' beliefs.[4] The majority's concern is with the two inquiries the University posed to religious-exemption applicants: 1) "Please explain why your sincerely held religious belief, practice, or observance prevents you from getting a

---

[4] On appeal Plaintiffs do not assert the Establishment Clause as a basis for enjoining the September 1 mandate. So, the majority is unnecessarily deciding this appeal on an issue that Plaintiffs themselves did not raise on appeal and barely mentioned in the district court.

COVID-19 vaccination?  Please include a detailed response."  And 2) "[h]ave you had an influenza or other vaccine in the past?  How does this differ?"  (Aplt. App. 1147.)

I disagree with the majority that this inquiry was unconstitutional.  The University is entitled to ask an individual requesting a religious exemption to explain the belief upon which that request is based.  See Mosier, 937 F.2d at 1525–26.  How else could the University determine whether and how it could accommodate the request?

The University is entitled to inquire whether the belief underlying the exemption request is religious, rather than secular, because the First Amendment's religious clauses protect only religious beliefs.  See Frazee, 489 U.S. at 833 (citing cases); see also Yoder, 406 U.S. at 215 ("A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief.").

Furthermore, it is never enough for an exemption applicant simply to assert that he or she has a religious belief that precludes the applicant from complying with a government mandate.  "The mere assertion of generic religious objections is not sufficient to invoke first amendment protections."  Dunn, 880 F.2d at 1197.

In addition, the University is entitled to determine whether the applicant's religious belief underlying the exemption request was sincerely held.  See Mosier, 937 F.2d at 1526.  Although determining whether a requested exemption is based on a sincerely held religious belief is, admittedly, "a difficult and delicate task," Thomas v. Rev. Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 714 (1981), the University is entitled to

15

undertake that inquiry.  See Frazee, 489 U.S. at 833 (stating, after indicating that Free Exercise Clause only protects religious, and not secular, beliefs and only religious beliefs that are sincerely held, that "States are clearly entitled to assure themselves that there is an ample predicate for invoking the Free Exercise Clause"); Snyder v. Murray City Corp., 124 F.3d 1349, 1352 (10th Cir. 1997) ("The first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those beliefs are sincerely held."), vacated in part on other grounds on rehearing en banc, 159 F.3d 1227, 1228 (10th Cir. 1998).  Here, for example, because the "practice or nonpractice of a particular tenet of a religion may be relevant to sincerity," although "not conclusive," Mosier, 937 F.2d at 1523, asking if an applicant has previously gotten other vaccinations is pertinent.

The majority, in support of its characterization of the University's inquiry as unconstitutionally "intrusive" for purposes of the Free Exercise Clause, relies on an Establishment Clause case, Colorado Christian University v. Weaver, 534 F.3d 1245 (10th Cir. 2008).  But that case is inapposite.  It did not address an inquiry into the religious nature or sincerity of beliefs underlying a request to be exempted from a generally applicable law, which is the relevant question in our case.  Instead, Colorado Christian concerned an Establishment Clause challenge to a Colorado statute that provided scholarships to students who attended colleges and universities in Colorado. 534 F.3d at 1250.  The statute expressly provided that those scholarships were available to students attending public and private schools, including sectarian schools, but were not

16

available to students attending "pervasively sectarian" schools.[5]  Id.  The statute provided

six criteria that a school had to satisfy in order not to be deemed "pervasively sectarian."

Id. at 1250–51.  Summarizing some of those factors, the Tenth Circuit explained:

> To determine whether a school is "pervasively sectarian," state officials are
> directed, among other things, to examine whether the policies enacted by
> school trustees adhere too closely to religious doctrine, whether all students
> and faculty share a single "religious persuasion," and whether the contents
> of college theology courses tend to "indoctrinate."

Id. at 1250.  The Tenth Circuit held that this statute violated the Establishment Clause

both 1) because it treated some religions (those that were not pervasively sectarian) more

favorably than others, and 2) because it required the State to inquire into various

religions' beliefs and practices in order to differentiate between sectarian and pervasively

sectarian institutions.  Id. at 1258, 1261–66.

Colorado Christian involved the State's determination as to whether sectarian

schools were "pervasively sectarian" by making intrusive determinations involving

religions' doctrines.  That case did not address at all, and so did not rule out, the

permissible inquiry into an individual's beliefs opposing a government mandate for

purposes of a Free Exercise analysis.

---

[5] At the time the Colorado legislature enacted this challenged statute, Supreme Court
precedent indicated that the Establishment Clause forbid state aid to "pervasively
sectarian" institutions.  534 U.S. at 1251–52.  The Supreme Court later "substantially
modified its interpretation of the Establishment Clause" to eschew the "pervasively
sectarian" standard, id. at 1251, but Colorado had not changed the language of the
challenged statute in light of that new Supreme Court precedent.  Id. at 1251–52.

Not only did <u>Colorado Christian</u> not call into doubt any inquiry into religious belief, that case involved a much more difficult and intrusive inquiry than the straightforward inquiry that the University (misguidedly) conducted here in determining whether an exemption applicant was a member of an organized religion that opposed all immunizations.

In contrast to <u>Colorado Christian</u>, there is established Supreme Court and Tenth Circuit case law permitting the University to inquire into the beliefs underlying applicants' requests for a religious exemption from the University's vaccine mandate. <u>See, e.g.</u>, <u>Frazee</u>, 489 U.S. at 833; <u>Snyder</u>, 124 F.3d at 1352; <u>Mosier</u>, 937 F.2d at 1525–26. <u>See generally</u> <u>United States v. Seeger</u>, 380 U.S. 163, 185 (1965) (stating sincerity of religious belief is question of fact).[6] <u>Colorado Christian</u> does not call that well-established authority into doubt.

The law is clear: The University was entitled to ask religious-exemption applicants about their beliefs opposing vaccination.

### C.  Conclusion as to the September 1 mandate

In conclusion, I agree with the majority that Plaintiffs adequately established that they are likely to succeed on their First Amendment challenges to the September 1 mandate, but I do not share the majority's reasoning, nor do I agree with the majority's

---

[6] Other circuits have reached similar conclusions. <u>See, e.g.</u>, <u>Mason v. Gen. Brown Cent. Sch. Dist.</u>, 851 F.2d 47, 51 (2d Cir. 1988) ("An individual's assertion that the belief he holds" is religious "does not . . . automatically mean that the belief is religious.  To the contrary, 'a threshold inquiry into the "religious" aspect of particular beliefs and practices cannot be avoided.'" (quoting <u>Int'l Soc'y for Krishna Consciousness, Inc. v. Barber</u>, 650 F.2d 430, 433 (2d Cir. 1981)).

sua sponte factual finding that the University was acting with religious animus.  Having shown a likelihood of success on the merits of their claims challenging the September 1 mandate on other grounds, however, I agree with the majority that Plaintiffs have further shown that the remaining requirements for a preliminary injunction favor enjoining the University's September 1 mandate.  Briefly stated, the continuing constitutional harm to Plaintiffs whose employment was terminated under the likely unconstitutional September 1 mandate is irreparable and that harm to those Plaintiffs outweighs the public's interest in the enforcement of the mandate.  Furthermore, the public interest is served by preventing constitutional violations.[7]

## II.  September 24 mandate

Just a few weeks after enacting its September 1 vaccine mandate, the University adopted a revised mandate that took effect September 24, 2021.  Different from the majority, I conclude Plaintiffs have <u>not</u> established a substantial likelihood that they will prevail on their First Amendment challenges to that September 24 mandate.  I would, therefore, affirm the district court's decision not to enjoin that second mandate.

---

[7] This balancing is close, in my opinion, because in the context of the concerns about COVID prevailing at the time the district court considered Plaintiffs' motion for a preliminary injunction, the University was justified in taking an aggressive approach to protect its patients, staff, facilities, and the public from the justified national concern about the devastating and life-threatening risk posed by COVID.  But the University could easily have taken a narrower and more focused approach and that informs my analysis on the weighing test.

**1. The September 24 mandate corrected the constitutional problems with the first mandate**

The September 24 mandate's basic vaccination requirements were the same as the September 1 mandate, but the September 24 mandate revised the provision of religious and medical <u>exemptions</u>.  As to religious exemptions, the September 24 mandate provided:

> Individuals may receive a medical or religious accommodation if they are unable to receive the vaccine for medical reasons or sincerely held religious beliefs as further described below. . . .
>
> . . . .
>
> A religious accommodation may be granted based on an employee's religious beliefs. . . . A religious accommodation will not be granted if the accommodation would unduly burden the health and safety of other Individuals, patients, or the campus community.
>
> Religious accommodations are not currently available to students or applicants.[8]

(Aplt. App. 1255–56 (footnote added).)  The University explained that "[p]ermitting an unvaccinated employee to work in-person" would "create[] an undue hardship on the University because it threatens the health and safety of the University's patients, employees, and community."  (<u>Id.</u> at 1329 ¶ 7.)  Therefore, the University approved religious exemptions only if the requesting employee's "duties can be modified to prevent any in-person interaction with the campus community or if the employee's job duties can be performed 100% remotely."  (<u>Id.</u> ¶ 8)

---

[8] I agree with the majority's conclusion that the students' claims seeking to enjoin the September 24 mandate are moot and this appeal does not involve any student's claims.

The September 24 mandate, therefore, eliminated the first mandate's constitutional problems.  The availability of a religious accommodation no longer depended on the applicant being a member of an organized religion or holding a religious belief that officially opposes all immunizations.  The September 24 mandate, instead, simply stated that, "A religious accommodation may be granted based on an employee's religious beliefs."  (Id. at 1256.)  There is no indication in the record that the University continued to pose the two-part inquiry to exemption applicants that the majority found objectionable under the September 1 mandate.  Moreover, the record indicates that the University, in applying the September 24 mandate to re-evaluate Plaintiffs' religious-exemption requests, did not deny any exemption request based on the substance of the asserted religious belief.  Instead, the University only applied the September 24 mandate's objective, non-religious criteria—whether the requested "accommodation would unduly burden the health and safety of other Individuals, patients, or the campus community" (id.)—to re-evaluate Plaintiffs' religious-exemption requests.  In making that undue-burden determination under the September 24 mandate, the University focused on each applicant's job duties, allowing the applicant to work remotely if possible, but denying an accommodation if the applicant's job required the applicant to work in-person.  There is no indication in the record that the University applied the September 24 mandate's objective, non-religious criteria incorrectly or in an unsupportable way that might suggest the University was using the mandate's objective criteria as a pretext for anti-religious animus.  I would, therefore, affirm the district court's determination that Plaintiffs failed to establish a substantial likelihood that they

will succeed on the merits of their First Amendment challenges to the September 24 mandate.

**B. The September 24 mandate is neutral toward religion and generally applicable**

I disagree with the majority's determination that the September 24 mandate must be strictly scrutinized because it is neither neutral toward religion nor generally applicable. See Fulton, 593 U.S. at 533 (stating laws that are neutral toward religion and generally applicable are constitutional if they are rationally related to a government interest, even if they incidentally burdens religion).

**1. Plaintiffs have not shown a substantial likelihood that the September 24 mandate was not neutral toward religion but was instead the product of the University's religious animus**

A Government regulation "is neutral 'so long as its object is something other than the infringement or restriction of religious practices.'" Harmon v. City of Norman, 61 F.4th 779, 794 (10th Cir. 2023) (quoting Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1232–33 (10th Cir. 2009)). It seems clear that the object of the September 24 mandate is not to infringe or restrict religious practices, but instead is to protect the health and safety of the University's faculty, staff, and patients by limiting the spread of COVID.

The majority disagrees, concluding instead that the September 24 mandate is a pretext to cover up the University's continuing (in my opinion, not established) anti-religious animus. After considering the "'[f]actors relevant to the assessment of governmental neutrality [which] include the historical background of the decision under

challenge, the specific series of events leading to the enactment or official policy in question,' and 'contemporaneous statements made by members of the decisionmaking body,'" Op. at 43 (quoting <u>Masterpiece Cakeshop</u>, 584 U.S. at 639), the majority deems the district court's factual finding that the September 24 mandate was not pretextual to be clearly erroneous.[9]  The majority bases that determination on its own appellate factual finding that the first mandate was the product of the University's animus toward certain religions.  But, as previously explained, I see no evidence indicating that the first mandate was the product of the University's actual hostility toward certain religions.  I, therefore, reject the majority's determination that the second mandate's objective, work-related criteria for granting a religious accommodation is actually a pretext to cover up that religious animus.

In support of its finding of pretext, the majority continues to cite to statements purportedly made by University officials in August and September 2021 that were hostile to particular religions, but again the majority fails specifically to identify any such statements.  As evidence of pretext, the majority notes that the University's application of the September 24 mandate reached the same results as the University reached under the first mandate—the same Plaintiffs whose jobs required in-person duties were not exempted and those whose job duties could be performed remotely were allowed to work

---

[9] The district court specifically found that the University's decision to amend its original "policy while navigating a monthslong global pandemic does not show that its reasons for denying religious exemptions <u>for students</u> are pretextual."  Op. at 43 (quoting the district court's order, Aplt App. 1670) (emphasis added).  Because we have concluded that the students' claims are moot, however, we do not address those claims in this decision.

remotely.  But, in applying the September 24 mandate, the University based those decisions exclusively on objective, non-religious criteria—each employee's job duties. No inquiry was made into the employees' religious beliefs.  Neither Plaintiffs nor the majority point to any evidence suggesting that the University applied the September 24 mandate's objective, non-religious criteria in an unsupportable way that might suggest that the University was using the mandate's objective criteria as a pretext for anti-religious animus.

The majority further points to the fact that the University adopted the September 24 mandate just a few weeks after adopting the first, likely unconstitutional mandate and only after some Plaintiffs threatened to sue.  The majority notes that the University took several weeks to apply the new mandate's objective criteria to re-evaluate Plaintiffs' religious-exemption requests.  Those facts, however, without more, do not suggest that the University applied the September 24 mandate's objective, non-religious criteria as a pretext to cover up the University's religious animus against some religions or some religious beliefs.  The record, then, simply does not support the majority's conclusion that the district court <u>clearly erred</u> in finding that the September 24 mandate was not a pretext for religious animus.

### 2.  Plaintiffs have not shown a substantial likelihood that the September 24 mandate is not generally applicable because it allegedly favors medical exemptions over religious exemptions

"To be generally applicable, a law may not selectively burden religiously motivated conduct while exempting comparable secularly motivated conduct."  <u>Does 1–6 v. Mills</u>, 16 F.4th 20, 29 (1st Cir. 2021) (citing <u>Lukumi</u>, 508 U.S. at 543).  Relevant here,

an ordinance is not generally applicable if "it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Fulton, 593 U.S. at 534.

I disagree with the majority's conclusion that the September 24 mandate, on its face, "grants secular exemptions on more favorable terms than religious exemptions."[10] Op. at 46. The September 24 mandate provides for "[a] religious accommodation . . . based on an employee's religious beliefs" unless "the accommodation would <u>unduly burden</u> the <u>health and safety</u> of other Individuals, patients, or the campus community." (Aplt. App. 1256 (emphasis added).) The University deems a religious exemption to unduly burden the health and safety of other individuals if it permits an unvaccinated employee to work in person.

A <u>medical</u> accommodation, on the other hand, "may be granted if vaccination is absolutely contraindicated due to other health conditions" unless "the accommodation poses <u>an undue hardship or the accommodation poses a direct threat</u> to the health or safety of the Individual or others." (<u>Id.</u> at 1255–56 (emphasis added).)

This language addressing religious and medical exemptions, while not identical, is essentially the same. Said another way, any slight difference in language does not establish that the September 24 mandate provides secular exemptions on more favorable terms than religious exemptions.

---

[10] Plaintiffs did not make this facial argument in the district court, nor do they make it now on appeal.

My conclusion is bolstered by the University's application of this language.  The record indicates that, under the September 24 mandate, the University has not permitted any unvaccinated person—whether unvaccinated because of medical reasons or religious objections—to work in person.  I would, therefore, conclude that Plaintiffs have failed to show a likelihood that they will succeed on their claim that the September 24 mandate is not generally applicable.

### 3.  The neutral and generally applicable September 24 mandate is rationally related to a government interest

Because Plaintiffs have failed to show the likelihood that the September 24 mandate is not neutral or generally applicable, it will be constitutional if it is rationally related to a government interest.  See Fulton, 593 U.S. at 533.  It clearly is rationally related to the University's interest in protecting the health and safety of its staff, patients, and students by stemming the spread of COVID.

## III. Conclusion

In sum, I agree with the majority that the September 1 mandate was likely unconstitutional and should be preliminarily enjoined.  My reasoning, however, differs from the majority.  I see no evidence that the University adopted that first mandate out of an animus, or actual hostility, toward certain religions or religious beliefs.  Nor do I think the questions the University posed to religious-exemption applicants under the first mandate were constitutionally objectionable.  Instead, I would conclude simply that the September 1 mandate likely violated the First Amendment because it favored some organized religions over others, and favored applicants who belonged to those favored

religions over other religious objectors.  On that basis I would preliminarily enjoin the September 1 mandate.

I would not enjoin the September 24 mandate, however, because Plaintiffs have not shown a substantial likelihood that they will prevail on the merits of their First Amendment challenges to that mandate.  That later vaccine mandate corrected the September 1 mandate's constitutional defects.  Further, Plaintiffs have not shown the likelihood that the September 24 mandate was neither neutral nor generally applicable.  In light of that, I would uphold the district court's determination that the September 24 mandate needed only to meet rational-basis review, and it did so.

Lastly, I note that the majority, at 55, seems to suggest that the dissent is disparaging Plaintiffs' religious beliefs as insincere.  Respectfully, nothing could be further from the truth.  Moreover, I agree with the majority that the September 1 vaccine mandate was unconstitutional.  Our only disagreement is over the constitutionality of the September 24 mandate, which I would uphold.  That second mandate did not involve any of the challenged inquiries into exemption applicants' religious beliefs.  Instead, the University applied that mandate strictly according to an objective evaluation focusing just on whether each applicant's job duties could be performed remotely.